**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James GADDY, William Thomas Danner, Defendants–Appellants.**

**No. 89–8223.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 20, 1990.

As Amended March 1, 1990.

Kenneth Kondritzer, Savannah, Ga., for defendants-appellants.

G. Terry Jackson, Savannah, Ga., for Danner.

Frederick Kramer, Asst. U.S. Atty., Savannah, Ga., for plaintiff-appellee.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

TUTTLE, Senior Circuit Judge:

This is an appeal by William Thomas Danner from (i) the district court's denial of his motion to suppress statements made to law enforcement officials and in grand jury proceedings; (ii) the denial of his motion for a *de novo* hearing by the district court; and (iii) the sentence imposed following conviction of kidnapping. Danner's former stepfather, James Lisk Gaddy, appeals from a judgment of conviction of kidnapping, interstate transportation of a stolen vehicle, sale and receipt of a stolen motor vehicle, possession of a stolen firearm and fraudulent use of stolen credit cards, on the ground that the court abused its discretion in refusing to grant a motion for mistrial because of the admission of allegedly prejudicial evidence.

## I. BACKGROUND

On February 23, 1988, William Thomas Danner was taken into custody by the Sheriff's Office of Chatham County, Georgia, on a lunacy warrant initiated by Danner's aunt, Janice Hernandez. Danner was drug-dependent and had a history of psychiatric problems. When apprehended, Danner was found to possess a .357 magnum pistol, stolen from Tennessee. State charges were brought against him for un-

lawful possession of a firearm by a convicted felon and theft by receiving stolen property. Danner was initially placed in Georgia Regional Hospital in Savannah, but was later released and placed in the Chatham County jail. He met with an appointed attorney who advised him not to make any statements. The appointed attorney discussed the charges against Danner extensively with Hernandez and advised her that Danner should not make any statements. The attorney subsequently withdrew, on March 25, 1988, and was replaced by new counsel.

On March 22, 1988, James Lisk Gaddy was arrested by the Chatham County police for violating parole; he had been operating a vehicle with stolen license plates just prior to his arrest. Law enforcement officials determined that the vehicle might be connected with a report of a person missing from Tennessee. Gaddy informed the police that he had obtained the vehicle from his stepson, Tommy Danner. FBI Agent King was brought in on the case, and Chatham County Detective Merriman was contacted. Since Gaddy had mentioned Danner's name, Merriman visited Danner in the county jail at about noon on March 23, to take a photograph of him. Merriman read Danner his *Miranda* rights. Appellant claims he then requested a lawyer and made no other statements. Detective Merriman testified that Danner did not request counsel and that Merriman did not question Danner at that time.

When Gaddy was arrested, he also mentioned Hernandez, whose sister had been married to Gaddy. Hernandez was employed by the Chatham County Police Department as a police officer with a job description of evidence technician. Hernandez was called into the office of Captain Lowery, of the same police department, and asked if she knew Gaddy; she replied that she did and that he (Gaddy) had been married to her sister at one time. Hernandez was told of Gaddy's arrest and that he possessed a vehicle that had been reported missing.

After taking photographs of Danner, Detective Merriman spoke with Hernandez, advising her that it would be in Danner's

best interest to cooperate. Merriman did not request that Hernandez talk to Danner, however. Hernandez communicated with Danner, urging him to reveal any information he had regarding Gaddy's arrest. He agreed, and Hernandez notified officials that Danner wished to speak; later that evening, Danner provided a detailed statement to Detective Merriman and Captain Lowery, after being advised of his *Miranda* rights and signing a waiver form.

Danner revealed that he and Gaddy abducted an individual, Alex Sparks, from a bowling alley parking lot in Tennessee and transported him to South Carolina, where Gaddy shot and killed the victim. According to Detective Merriman and Captain Lowery, Danner never indicated during their meeting that he wished to have a lawyer or that he desired to remain silent. After providing the statement, Danner led officers to the victim's body in South Carolina. Danner gave a written statement on March 24 and another statement on April 4, 1988.

On April 6, 1988, Danner appeared before a federal grand jury and requested to have his attorney present before being questioned. The attorney who was representing him on the state charges could not be reached. The federal prosecutor advised the jurors that they could either forego the witness's testimony or bring Danner back at a later time when he had an attorney to represent him. Danner was re-advised of his right not to answer any question which would tend to incriminate him and of his right to consult with an attorney before answering any questions. He indicated that he understood. The prosecutor informed Danner that the grand jury was "willing to listen to you right now or they'll listen to you tomorrow." Danner proceeded with a detailed statement which was consistent with his earlier statement to law enforcement officers.

In April 1988, Danner was indicted on federal charges of kidnapping, interstate transportation of a stolen automobile, interstate transportation of a stolen firearm, possession of a firearm by a convicted felon and use of stolen credit cards. Danner

filed a motion to suppress the statements he had made and his grand jury testimony, which the district court denied, adopting the recommendation of the magistrate.

Before the district court adopted the magistrate's report and recommendation, Danner filed a motion for a *de novo* suppression hearing, which the court denied. On January 6, 1989, Danner entered a plea of guilty to the kidnapping charge, and the remaining counts were dismissed. Danner reserved the right to appeal the denial of his suppression motion. Danner was sentenced to 210 months in prison and five years of supervised release.

Appellant Gaddy was tried before a jury and convicted on all counts, except the charge of possession of a firearm by a convicted felon, which was severed and later dismissed. Gaddy was sentenced to life imprisonment on the kidnapping charge and to five- and ten-year concurrent sentences on the remaining counts.

## II. DISCUSSION

### A. *Danner's Confession*

#### (i) Fifth Amendment Claim

Danner contends that he told Detective Merriman at noon on March 23, 1988 that he wanted an attorney, that Danner did not initiate any further communication with the police thereafter, and that he merely submitted to questioning later that evening, resulting in a violation of his Fifth Amendment rights.

██ The Fifth and Fourteenth Amendment protection against compelled self-incrimination provides the right to counsel during any custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 470–71, 86 S.Ct. 1602, 1625–26, 16 L.Ed.2d 694 (1966).

> [A]n accused, ... having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police.*

*Edwards v. Arizona,* 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981) (emphasis added). In *Edwards,* petitioner had moved to suppress his confession on the ground that his *Miranda* rights had been violated when police officers returned to the jail to interrogate petitioner the day after he had invoked his right to counsel and questioning had ceased. Reversing a finding of waiver of petitioner's right to counsel, the Supreme Court held that "a valid waiver ... cannot be established by showing only that [an accused] responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Id.* 451 U.S. at 484, 101 S.Ct. at 1884. The Court further stated, "[h]ad [petitioner] initiated the meeting ..., nothing in the Fifth and Fourteenth Amendments would prohibit the police from merely listening to his voluntary, volunteered statements and using them against him at the trial." *Id.* at 485, 101 S.Ct. at 1885.

█ In the instant case, Detective Merriman and Captain Lowery returned to talk to Danner the evening of March 23 only after Hernandez contacted Captain Lowery and informed him that Danner wished to volunteer information about his dealings with Gaddy. Danner's principal contention on appeal is that when Hernandez contacted him and encouraged him to speak with the authorities, she was acting as a police officer and government agent, so that Danner's subsequent meeting was police-initiated.

The magistrate found that Janice Hernandez was not part of the investigative team on Danner's or Gaddy's case, was not directed by a superior to contact Danner, and acted solely out of concern for his welfare, and that there was no evidence that Hernandez was acting in the normal course of her duties when she initiated contact with her nephew; thus, she was not an agent of the government but acted as a private citizen. It is undisputed that Hernandez initiated the telephone conversation with Danner while he was in jail. Accord-

ing to Hernandez's affidavit, she had personal knowledge of both Gaddy's and Danner's "history." She became "very concerned for Tommy's [Danner's] welfare." She then had a message delivered to Danner to call her, which he did. Even though Hernandez learned that Danner might be a suspect in the case involving the stolen vehicle and missing person through her affiliation with the police department, Captain Lowery contacted her because Gaddy mentioned her name. She could have taken the same action had she been reached at her home, as a private citizen who might provide a lead to the detectives. Hernandez communicated with Danner, not to assist the police department in solving a crime, but to protect her nephew.

Hernandez exhibited the same concern for her nephew when she initiated the lunacy warrant for Danner's arrest. At that time, she acted as a private citizen, a concerned relative attempting to protect Danner from harm. Likewise, by encouraging Danner to tell the police what he knew, she acted as a worried aunt who envisioned the hardship that could befall her nephew if he did not reveal the information he possessed, especially before Gaddy rendered his version of the events to the police. The evidence shows that at the time Hernandez contacted Danner she was employed by the Chatham County Police Department, but that even though she was a police officer,[1] her duties were not investigative in nature. She contacted Danner of her own accord, not at the direction of a superior and not for the benefit of the police department. She made no written report following that communication, as would have been customary had Hernandez been acting in an official capacity. Thus, no police-initiated interrogation occurred.

Even though the police did not initiate the meeting and Danner volunteered his confession, "any statements made are still inadmissible unless they are the product of a knowing and voluntary waiver." *Dunkins v. Thigpen,* 854 F.2d 394, 397 (11th Cir.1988) (citing *Oregon v. Bradshaw,* 462

[1] The record contains her certificate of training in law enforcement and a basic certification of minimum qualifications of the Peace Officer Standards and Training Council.

U.S. 1039, 103 S.Ct. 2830, 77 L.Ed.2d 405 (1983)), *cert. denied,* —— U.S. ——, 109 S.Ct. 1329, 103 L.Ed.2d 597 (1989). If, at a meeting initiated by the accused, the officers "say or do something that clearly would be 'interrogation,' ... the question would be whether a valid waiver of the right to counsel ... had occurred, that is, whether the purported waiver was knowing and intelligent ... under the totality of the circumstances." *Edwards,* 451 U.S. at 486 n. 9, 101 S.Ct. at 1885 n. 9. Relying upon the testimony of a clinical psychologist who examined Danner and a review of the March 23 tape-recorded meeting between Danner and investigating officers, the magistrate concluded that defendant was sufficiently competent to understand his Fifth and Sixth Amendment rights and knowingly and intelligently waived those rights.

■ "A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The relinquishment of the right must have been voluntary, in that it resulted from a free and deliberate choice and not from coercion. *Moran v. Burbine,* 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986). Danner signed a waiver form and proceeded to relate the events of the kidnapping and murder in a detailed and lucid manner. There is no evidence of police overreaching, and appellant does not argue on appeal that any waiver was involuntary due to coercion. *See Dunkins,* 854 F.2d at 399. Thus, his waiver was voluntary.

■ A valid waiver of *Miranda* rights must also be knowingly and intelligently made. *Miller v. Dugger,* 838 F.2d 1530, 1538 (11th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, "including the background, experience, and conduct of the accused." *Johnson v. Zerbst,* 304 U.S. at 464, 58 S.Ct. at 1023. A criminal suspect is not required to know and understand every possible consequence of a waiver for it to be knowingly and intelligently made.

*See Colorado v. Spring,* 479 U.S. 564, 574, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987) (suspect's awareness of all possible subjects of questioning prior to interrogation is not relevant to determining whether suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege). The *Miranda* warnings ensure "that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time." *Id.* Danner testified that he had above average intelligence "under the right medication." Moreover, although appellant has a history of emotional problems and addiction to his prescribed drugs, mental illness is only a factor to be weighed in determining the validity of a waiver. *Dunkins,* 854 F.2d at 399. Danner did not exhibit "scattered" thinking, "panicky" behavior, "linking circumstances together that really didn't belong together" or other symptoms which, the expert clinical psychologist testified, would indicate Danner was experiencing severe depression or anxiety. Danner has a dependent personality disorder, yet he is not completely without the will to refuse the requests of others, even when under medication. The expert testified that Danner would understand at least some of the consequences of his acts. He has previously been convicted, for armed robbery and aggravated assault, and is, therefore, no novice to law enforcement procedures. Viewing the totality of the circumstances, the record supports the finding that Danner's waiver was also knowing and intelligent.

#### (ii) Sixth Amendment Claim

■ Danner further contends that since counsel had already been appointed to represent him on the state firearms charges, his Sixth Amendment rights were violated when the police interviewed him and obtained oral and written statements from him in the absence of counsel.

The Sixth Amendment guarantees an accused the right to the assistance of counsel in all criminal prosecutions. An individual's right to legal representation during interrogation by the government attaches

once adversary proceedings have commenced, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972); *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *United States v. Gouveia*, 467 U.S. 180, 189, 104 S.Ct. 2292, 2298, 81 L.Ed.2d 146 (1984). In *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), the Supreme Court held that the accused was denied his Sixth Amendment protections when incriminating evidence was used against him at his trial which federal agents had deliberately elicited from him after he had been indicted and without counsel present. Law enforcement officers had installed a radio transmitter in a co-defendant's car and instructed the co-defendant to elicit information from the defendant, after his right to counsel had attached. In *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980), the Court also found a deliberate elicitation of incriminating statements during interrogation by the government. While the accused was in custody after his indictment, he made incriminating statements to an undisclosed, undercover government informant sharing the same cellblock, whom government agents had told to be alert to any statements made by other prisoners but not to initiate any conversation with or question Henry.

Even the "knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation not to circumvent the right to the assistance of counsel as is the intentional creation of such an opportunity." *Maine v. Moulton*, 474 U.S. 159, 176, 106 S.Ct. 477, 487, 88 L.Ed.2d 481 (1985). In *Moulton*, the Court affirmed the suppression of taped conversations the government arranged to have recorded between defendant and his former co-defendant, who was an undercover informant for the police.

The parties refer us to no cases which present facts resembling those in the instant case. The magistrate's report cites cases involving "government" or "jailhouse" informants, which appellant argues do not apply here. Those as well as the above-cited cases establish, however, that any informant must be acting for the state. For example, in *Lightbourne v. Dugger*, 829 F.2d 1012 (11th Cir.1987), *cert. denied*, — U.S. —, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988), this Court stated that "[i]n order to establish a violation of the Sixth Amendment in a jailhouse informant case, the accused must show (1) that a fellow inmate was a government agent; and (2) that the inmate deliberately elicited incriminating statements from the accused." *Id.* at 1020 (citing *Henry*, 447 U.S. at 270, 100 S.Ct. at 2186). Thus, "[t]he ultimate issue is whether what has happened is the functional equivalent of interrogation by the government." *Id.* at 1028 (Anderson, J., dissenting).

We have already concluded that Danner's statements were not made as a result of police-initiated interrogation; they occurred because Danner's aunt, in her private capacity, urged him to speak and he agreed. Therefore, the circumstances under which the government obtained statements from Danner were not the functional equivalent of government interrogation. Since Danner's statements were not given at the urging of or due to the exploitation by a federal agent, the district court properly denied the suppression of the statements offered in the absence of counsel.

### B. *Danner's Grand Jury Testimony*

Danner contends that his grand jury testimony should have been suppressed because he expressed his desire to consult with an attorney at the start of the grand jury proceeding and none was provided for him. Once Danner made the request, he was taken out of the grand jury room and into the hallway to call the attorney representing him in connection with the state charges.

While Danner was outside the grand jury room, the prosecutors and the jurors discussed the alternatives available to them and to Danner if he was unable to reach his attorney. The foreman stated:

FOREMAN: I would suggest that we handle it on the basis that if Mr. Danner has anything he would voluntarily like to say we'll be glad to listen to it. If he prefers not to talk without professional counsel then we understand that position, too, and we'll excuse him.

. . . .

And then, if he wants to voluntarily appear before the Grand Jury he can let us know that that's his desire.

Danner was brought back into the grand jury room, after learning that his attorney was out of the country. When Danner reentered, the prosecutor advised him that he need not answer any question which would tend to incriminate him and that he had a right to consult with an attorney before answering any questions. The prosecutor asked if he understood, and Danner replied that he did. The prosecutor continued:

All right. The Grand Jury wants to offer you an opportunity at this time to say to them anything that you wish to or to answer any questions that you wish to at this time knowing that you're not represented by counsel at this time. Basically, what we're saying is if there is anything you want to say before you want—before you talk to your attorney or without consulting with an attorney the Grand Jury is giving you an opportunity to say that.

If there is nothing you want to say without consulting with an attorney then the Grand Jury will see to it that you're appointed an attorney to represent you in this proceeding through the U.S. Magistrate here, that you consult with that attorney, and then give you the opportunity to return and say anything you wish to or answer any questions that you must answer, not under the Fifth Amendment privilege, after consulting with your attorney.

Danner was further advised:

[T]he Grand Jury is going to provide you an opportunity tomorrow—in other words, you can talk with an attorney this evening or tomorrow morning and they'll provide for you to come back. I mean, they're willing to listen to you right now or they'll listen to you tomorrow. It's your option and I just want the record to clearly show that, you know, we're giving you an option here and we'll do it however you want to do it.

He responded: "Okay. Well, I'll go—go ahead and ask me questions and I'll answer."

Danner maintains on appeal that he testified merely to get back to the jail quickly so he could obtain his medication, which he desperately needed. Danner insists that he was placed in a coercive setting, and once he invoked his right to counsel he could not be questioned without an attorney present.

■ A witness called by the grand jury is legally bound to testify, *United States v. Calandra*, 414 U.S. 338, 343, 94 S.Ct. 613, 617, 38 L.Ed.2d 561 (1974). This duty is subject to the assertion of the Fifth Amendment privilege against compelled self-incrimination, *United States v. Mandujano*, 425 U.S. 564, 572, 96 S.Ct. 1768, 1774, 48 L.Ed.2d 212 (1976). In *Mandujano*, the Supreme Court declined to accord a grand jury witness the same rights as a person in police custody. While the latter has an absolute right to refuse to answer *any* question, the former "has an absolute duty to answer all questions, subject only to a valid Fifth Amendment claim." *Id.* at 581, 96 S.Ct. at 1778–79. The Fifth Amendment does not preclude a witness from voluntarily offering self-incriminating testimony, however. *United States v. Washington*, 431 U.S. 181, 186–87, 97 S.Ct. 1814, 1818–19, 52 L.Ed.2d 238 (1977) (citing *United States v. Monia*, 317 U.S. 424, 427, 63 S.Ct. 409, 410, 87 L.Ed. 376 (1943)). In *Washington*, a grand jury witness who later became a defendant was given explicit *Miranda* warnings before responding to the grand jury's questions. The Supreme Court found that the record revealed no compulsion of testimony, 431 U.S. at 188, 97 S.Ct. at 1819, and, accordingly, held that the testimony should not have been suppressed. *Id.* at 191. This Court has not decided whether a constitutional right to counsel exists during the course of a grand

jury proceeding. *See United States v. Olmeda,* 839 F.2d 1433, 1437 (11th Cir. 1988) ("For even if appellant has a constitutional right to consult with an attorney during the course of the grand jury proceeding, the failure of the government to provide an attorney for her does not excuse perjury on her part."). In *Mandujano,* the respondent had been informed that he was entitled to the assistance of counsel outside the grand jury room. The Court stated:

> No criminal proceedings had been instituted against respondent, hence the Sixth Amendment right to counsel had not come into play. *Kirby v. Illinois,* 406 U.S. 682 [92 S.Ct. 1877, 32 L.Ed.2d 411] (1972). A witness 'before a grand jury cannot insist, as a matter of constitutional right, on being represented by his counsel....' *In re Groban,* [352 U.S. 330, 333 [77 S.Ct. 510, 513, 1 L.Ed.2d 376] (1957)]. Under settled principles the witness may not insist upon the presence of his attorney in the grand jury room. Fed.Rule Crim.Proc. 6(d).

*Id.* (footnote omitted).

■ State criminal proceedings had been instituted against Danner, however, for which counsel was appointed. Even assuming Danner thereby had a right to counsel either in or outside the grand jury room, Danner voluntarily testified, without compulsion, waiving that right. Danner did not indicate at that time that he needed to return to the jail for medication, and the assistant United States attorney, at the jury foreman's request, clearly explained to Danner his options once it was determined that his attorney was unavailable.

We also agree with the ruling below that no prosecutorial misconduct occurred. Danner elected to proceed with his testimony after having been clearly advised of his alternatives.

### C. *Motion for De Novo Suppression Hearing*

■ Appellant Danner claims the district court abused its discretion in refusing to hold a *de novo* hearing before adopting the magistrate's report. Danner asserts additional evidence existed—testimony of Hernandez—to negate the magistrate's findings regarding her status.

Appellant was not entitled to a *de novo* hearing but only to a *de novo* review by the district court of those parts of the magistrate's recommendation to which objection was made. 28 U.S.C. § 636(b)(1); [2] *United States v. Veteto,* 701 F.2d 136, 140–41 (11th Cir.), *cert. denied,* 463 U.S. 1212, 103 S.Ct. 3548, 77 L.Ed.2d 1396 (1983). The magistrate conducted two hearings, giving appellant the opportunity to supplement the record, and admitted affidavit testimony of Hernandez. The district court had all of the pertinent evidence before it and did not abuse its discretion in denying appellant's motion.

### D. *Danner's Sentence*

■ Danner objects to the offense level computation based on § 2A4.1(b)(4)(A) of the sentencing guidelines. That section provides that if the kidnapping victim was not released before thirty days had elapsed, the base offense level should be increased by two levels. Alex Sparks was not detained but was shot within 24 hours after being abducted. He was merely found sometime after 30 days had elapsed. The guideline does not address whether murder of the victim means the kidnappers failed to release him within 30 days. The Commentary to the guidelines states under "Background":

> The guideline contains an adjustment for the length of time that the victim was detained. The adjustment recognizes the increased suffering involved in lengthy kidnappings and provides an incentive to release the victim.

The victim here was never released alive; the district court properly accepted the probation officer's recommendation calculating the offense level to include an increase

---

2. Section 636(b)(1) provides in part:
   A judge of the court shall make a de novo determination of those portions of the [magistrate's] report or specified proposed findings or recommendations to which objection is made.
   28 U.S.C. § 636(b)(1).

under § 2A4.1(b)(4)(A). This is especially true in this case, where the sentencing court could have increased the sentence above the authorized guideline range because the offense resulted in the death of the victim, but the court did not. § 5K2.1 (Policy Statement); *see also United States v. Melton*, 883 F.2d 336 (5th Cir.1989). Increasing the offense level when the kidnapping victim is murdered also comports with the stated purpose of the provision, to provide an incentive to the kidnapper to release the victim.

### E. *Gaddy's Motion for Mistrial*

 At Gaddy's trial, Danner testified that Gaddy exerted control over him and often beat him. On cross-examination, Danner mentioned a prior incident in which Gaddy attempted to shoot a woman. Gaddy's counsel moved for a mistrial, which the court denied. Danner had noted the same incident in earlier testimony, without objection by Gaddy's counsel. Also, the evidence against Gaddy was so overwhelming that we consider any error harmless beyond a reasonable doubt.

We AFFIRM the convictions and the judgments of the district court as to Gaddy and Danner.