**Michigan Supreme Court**
**Lansing, Michigan 48909**

# Opinion

Chief Justice
Maura D. Corrigan

Justices
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Clifford W. Taylor
Robert P. Young, Jr.
Stephen J. Markman

**FILED APRIL 22, 2004**

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                         **No. 121300**

JOHN RODNEY MCRAE,

    Defendant-Appellant.

_____

**BEFORE THE ENTIRE BENCH**

**CORRIGAN, C.J.**

In this case we must determine whether the admission of statements made by defendant to a sheriff's reserve deputy violated defendant's Sixth Amendment rights. We conclude that the admission of the statements did violate defendant's Sixth Amendment rights because, under the circumstances in this case, the reserve deputy was a state actor at the time he questioned defendant, who had not waived his Sixth Amendment right to counsel. We have already concluded that such an error would not be harmless

beyond a reasonable doubt;[1] therefore, we reverse the decision of the Court of Appeals and remand for a new trial.

## I.  FACTUAL HISTORY AND PROCEDURAL POSTURE

Defendant was charged with first-degree murder after the remains of fifteen-year-old Randy Laufer were found on the grounds of defendant's previous residence. After defendant was arrested, he received his *Miranda*[2] warnings and invoked both his Fifth Amendment right to be free from compelled self-incrimination and his Sixth Amendment right to counsel. After arraignment, while defendant was in custody awaiting trial, defendant apparently requested to speak to an old neighbor, Dean Heintzelman. It had been ten years since defendant had seen Heintzelman, and defendant was unaware that Heintzelman had become a reserve police officer. Further, defendant was unaware that both Heintzelman and Heintzelman's son were part of the police team present at the scene when Randy Laufer's body was recovered.

Heintzelman visited defendant after he finished his shift as a reserve deputy. Before visiting defendant, Heintzelman asked the permission of one of the corrections

---

[1] 465 Mich 874 (2001).

[2] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

officers to do so.  Heintzelman was in full uniform, complete with badge.  Although it was some time after eleven o'clock at night, Heintzelman was allowed to go directly to defendant's maximum security cell.  Heintzelman later testified that he had the following conversation with defendant:

> Well, first we just started talkin', talkin' about – shook hands and everything, you know, like I hadn't seen him in a long, long time. . . . I asked him about his boy, Marty, 'cuz his boy Marty is the same age as my son. . . . I told him, I said, "Well, Marty's in here from what I understand, too."[3]  And then he showed me pictures of Marty's wife and his baby, and we carried on a conversation, like you or I would.

> And then I said – I asked John – I said, "John, did you do what you're charged with here?"  And he didn't answer me.  So we just went talkin' again about, well, more or less about Marty again.  And I said, "Well, you know, they think Marty had something to do with that, you know, with Randy."  And he says, "Well, if they try to pin it on Marty, I'll let 'em fry my ass."  And that was his words.

> I said, "John, did you do it?"  And he just hung his head down and said, "Dean, it was bad. It was bad."  That's – we didn't discuss it any more.

After questioning defendant about the charges, Heintzelman reported the discussion to Lieutenant McClellan, who was the officer in charge of the Laufer investigation scene. Heintzelman then volunteered to go back and talk to

---

[3] Defendant's son had been held as an accessory to the murder.

3

defendant if McClellan requested. Heintzelman was not permitted to speak with defendant again.

Defendant moved to suppress Heintzelman's testimony regarding defendant's statements because the alleged statements were obtained in violation of defendant's right to counsel and because defendant was not given *Miranda* warnings again before questioning. After an evidentiary hearing, the trial court denied defendant's motion to suppress on the ground that defendant had initiated the conversation. After defendant was convicted by a jury of first-degree murder, he challenged on appeal the admission of the statements.[4] The Court of Appeals did not determine if there was error, ruling instead that, even if the admission were error, it was harmless beyond a reasonable doubt.[5]

Upon defendant's first application for leave to appeal, this Court determined that if the admission of the statement were error, such error would not be harmless beyond a reasonable doubt. This Court vacated the Court of

---

[4] Defendant also raised two other issues that are not before this Court.

[5] Unpublished opinion per curiam, issued January 12, 2001 (Docket No. 217052).

4

Appeals judgment in part and remanded the case for reconsideration of defendant's claim of error.[6]

On remand, the Court of Appeals held that the trial court did not err in admitting this evidence, because "the statement at issue was made in the context of a conversation between former friends, which, as the trial court in this case found, was initiated by the defendant."[7]

Defendant again appealed to this Court, and we granted leave, directing the parties to address: "(1) whether defendant's statements to Officer Heintzelman constituted the interaction of custody and official interrogation, as discussed in *Illinois v Perkins*, 496 US 292 [110 S Ct 2394; 110 L Ed 2d 243] (1990), and (2) whether Officer Heintzelman was a state actor at the time defendant made the statements to him." 468 Mich 921 (2003).

## II. STANDARD OF REVIEW

In order to determine whether a constitutional error occurred, we must first determine whether Heintzelman was a state actor, which is a mixed question of fact and law. We review for clear error a lower court's findings of fact,

_____

[6] 465 Mich 874 (2001).

[7] Unpublished opinion per curiam, on remand, issued February 12, 2002 (Docket No 217052), slip op at 5.

5

MCR 2.613(C), and review de novo questions of law. *People v Herron*, 464 Mich 593, 599; 628 NW2d 528 (2001).

### III. DISCUSSION

#### A. STATE ACTOR ANALYSIS

The people argue that Heintzelman was not a state actor because he did not visit defendant in an official police capacity, but was invited to visit defendant as a former neighbor and friend. That defendant was unaware of Heintzelman's reserve deputy status when he asked to see him, however, does not end the inquiry.

In *Griffin v Maryland*, 378 US 130, 135; 84 S Ct 1770; 12 L Ed 2d 754 (1964), the Supreme Court held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law."[8]  It is clear from the record that Heintzelman

---

[8] Although we agree with the dissent that not every act performed by someone who happens to be a police officer constitutes state action, it must be noted that the cases cited by the dissent in support can be distinguished from this case.

Only one case, *United States v McGreevy*, 652 F2d 849 (CA 9, 1981), involves a constitutional challenge. In *McGreevy*, the defendant alleged a Fourth Amendment violation because the Federal Express worker who searched his package also happened to be a police officer. The court rejected the Fourth Amendment claim on the ground

6

that the FedEx worker was not acting under color of state law when he opened the package. The court noted that the worker did not obtain his FedEx job as a result of being a police officer and "carefully separated" the two jobs. *Id.* at 851. The same cannot be said for Heintzelman. At the time he questioned defendant, Heintzelman was present at defendant's maximum-security cell at 11:30 PM by virtue of his status as a sheriff's reserve deputy. He did nothing to "carefully separate" himself from his apparent authority.

The remaining cases cited by the dissent are civil claims brought under 42 USC 1983. The dissent does not explain why these civil cases, predicated on federal statute, should be dispositive for purposes of constitutional claims. Although the United States Supreme Court has held that conduct that is state action for constitutional purposes is action "under color of state law" for § 1983 purposes, it has never held that the opposite is true. In other words, conduct that fails to constitute action "under color of state law" for § 1983 purposes does not necessarily fail to represent state action for constitutional purposes. In *Nat'l Collegiate Athletic Ass'n v Tarkanian*, 488 US 179, 182 n 4; 109 S Ct 454; 102 L Ed 2d 469 (1988), the United States Supreme Court merely stated that in *that case*, in which the plaintiff claimed he had been deprived of his Fourteenth Amendment due process rights in violation of § 1983, "the under-color-of-law requirement of 42 U.S.C. § 1983 and the state-action requirement of the Fourteenth Amendment are equivalent." We read the footnote as merely setting forth the unremarkable conclusion that, for Fourteenth Amendment violations premised on violations of § 1983, the two state-action inquiries are equivalent. This case, however, involves a very different inquiry.

The other § 1983 cases cited by the dissent can be similarly distinguished. In *Barna v Perth Amboy*, 42 F3d 809 (CA 3, 1994), the plaintiffs brought a civil action under 42 USC 1983 as a result of an alleged assault by the defendant police officers. The assault occurred when one of the off-duty police officers thought he saw one of the plaintiffs strike his sister and intervened. The court held that this initial altercation was a family dispute and that the off-duty officers were therefore not acting under color of state law. *Id.* at 815. Because of the personal nature of the dispute, the court concluded that the use of the police-issued night stick in the fight, although

possessed *actual* state authority — he was deputized as a Clare County sheriff's reserve deputy. The dispositive question, then, is whether Heintzelman purported to act under that authority.

The word "purport" means: "1. to present, esp. deliberately, the appearance of being; profess or claim . . . . 2. to convey, express or imply." *Random House*

objective indicia of police authority, did not transform the personal family dispute into an action taken under color of state law.

*Bosignore v City of New York*, 683 F2d 635 (CA 2, 1982), involved an off-duty police officer who used his police-issued revolver to shoot his wife and then commit suicide. The wife survived and attempted to bring a claim under 42 USC 1983. The court rebuffed her attempt, stating simply that the officer was not acting under color of state law since his actions in shooting his wife and committing suicide were not committed in the performance of any actual or pretended duty, but were personal pursuits. *Id.* at 638-639.

In *Delcambre v Delcambre*, 635 F2d 407 (CA 5, 1981), the plaintiff was assaulted by her brother-in-law, who also happened to be the police chief. The plaintiff's § 1983 action was dismissed because the Court found that the altercation arose out of family and political matters and that the plaintiff was neither arrested nor threatened with arrest. Under the circumstances, the court found that the family and political dispute was not conducted under color of state law. *Id.* at 408.

All the above cases involved truly personal matters. The same cannot be said here. It was only by virtue of his position as a governmental agent that Heintzelman was able to question defendant at the location and time he did. Further, given the decade that had lapsed without any contact between the two and Heintzelman's subsequent offer to Lieutenant McClellan to obtain more information, any claims that Heintzelman was solely acting out of concern for defendant's welfare are suspect.

*Webster's College Dictionary* (2d ed). The record evidence shows that Heintzelman visited defendant in his full uniform, thus creating the appearance that he was a state actor. Further, Heintzelman received permission from a corrections officer to visit defendant late at night in his maximum-security cell. The people conceded at oral argument that an ordinary citizen would not have been granted permission under the same circumstances. Thus, it was only by virtue of his status as a reserve deputy that Heintzelman was granted direct access to defendant's maximum-security cell, a restricted area where only governmental agents are normally allowed to tread. Further, this access was granted late at night, a time when ordinary citizens are prohibited from visiting inmates.[9]

There is no evidence that Heintzelman sought to distance himself from his actual or apparent police authority. Instead, defendant was questioned in the middle of the night by a sheriff's reserve deputy (albeit one he had known a decade earlier) in full uniform. Indeed, Heintzelman's actions during and after the questioning only reinforced his actual or apparent authority. During his

---

[9] Again, we stress that Heintzelman's visit to defendant at his maximum-security cell at 11:30 PM is significant not because it somehow means Heintzelman tried to "catch defendant off guard" as suggested by the dissent, but because *only* governmental agents were allowed access to maximum-security cells, particularly at that time of night.

"conversation" with defendant, Heintzelman twice brought up the subject of defendant's son in an apparent attempt to get defendant to answer Heintzelman's questions. Further, after he spoke to defendant, Heintzelman contacted the lieutenant in charge of the investigation, relayed the contents of the conversation, and offered to obtain more information. Finally, it is also telling that Heintzelman was not allowed any further contact with defendant for fear of violating defendant's Sixth Amendment rights.

The facts of this case distinguish it from *United States v Gaddy*, 894 F2d 1307 (CA 11, 1990), cited by the dissent. In *Gaddy,* the defendant's aunt was a police officer. Through her position as an officer, she learned that the defendant was in custody. A detective advised the aunt that it would be in her nephew's best interest to cooperate, but did not request that the aunt talk to the nephew. The aunt contacted the nephew from her home and encouraged him to speak. He agreed and spoke to officials after waiving his Fifth Amendment and Sixth Amendment rights.

In determining that the aunt was not a state actor, the court noted that the aunt was not part of the investigative team on the defendant's case and acted solely out of concern for his welfare. *Id.* at 1311. In contrast, here Heintzelman *was* part of the police team present for

10

the recovery of the victim's body from defendant's former residence.  Further, it cannot be said that Heintzelman was acting solely out of a concern for defendant's welfare.  He had not seen or spoken to defendant in *ten years*, and, upon reporting the conversation to his superior, volunteered to obtain more information from defendant.  Thus, the lack of any close relationship between Heintzelman and defendant, along with Heintzelman's actions after speaking to defendant, distinguish this case from *Gaddy*.[10]

Taken together, the evidence shows that Heintzelman was possessed of state authority and purported to act under that authority.  Therefore, under *Griffin*, his action is state action.

### B.  SIXTH AMENDMENT ANALYSIS

The next issue is whether Heintzelman's questioning of defendant violated the Sixth Amendment guarantee of the right to counsel.  In *Edwards v Arizona,* 451 US 477, 484; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the United States

---

[10] Similarly, the facts of this case distinguish it from *Cook v Georgia*, 207 Ga 820; 514 SE 2d 657 (1999). First, although the defendant's father in *Cook* was an FBI agent, the FBI was not exercising jurisdiction over the case—it was purely a state matter.  In contrast, here Heintzelman was not only a part of the police team present at the recovery of the victim's body, but was a part of the agency that had jurisdiction over the case.  Further, it cannot be contended that Heintzelman's relationship with defendant, whom he had not seen or spoken to in a decade, is akin to that of a father and son.

Supreme Court established the bright-line rule that an accused, having expressed a desire to deal with the police only through counsel, may not be subject to further interrogation by the authorities until counsel has been made available unless the accused initiates further communication. The initiation of a conversation related to the investigation, standing alone, is insufficient to establish a waiver of the previously asserted right to counsel. We incorporated the *Edwards* rule in *People v Paintman,* 412 Mich 518; 315 NW2d 418 (1982), and the *Edwards* rule was extended to Sixth Amendment claims in *Michigan v Jackson*, 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986).

It is important to note that the Sixth Amendment may be violated by questioning that does not rise to the level of the custodial interrogation required under the Fifth Amendment. In *Fellers v United States*, 540 US ___; 124 S Ct 1019; 157 L Ed 2d 1016 (2004), a unanimous Supreme Court clarified that "an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of counsel.'" *Id.* at 4, citing *Massiah v United States*, 377 US 201, 206; 84 S Ct 1199; 12 L Ed 2d 246 (1964). The

Court continued: "We have consistently applied the deliberate-elicitation standard in subsequent Sixth Amendment cases . . . and we have expressly distinguished this standard from the Fifth Amendment custodial-interrogation standard . . . ." *Id.* This is consistent with the Court's holding in *Michigan v Jackson*, *supra* at 632 n 5, that the Sixth Amendment provides a right to counsel even when there is no interrogation and no Fifth Amendment applicability.

Even under *Edwards*, however, the initiation of *any* verbal exchange with governmental agents is insufficient to permit further questioning. In *Oregon v Bradshaw,* 462 US 1039; 103 S Ct 2830; 77 L Ed 2d 405 (1983), a four-justice plurality ruled that communications were "initiated" for purposes of the *Edwards* rule by conversation that "represent[s] a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." *Id*. at 1045. The dissenting justices would have defined "initiation" even more narrowly as a communication or dialog about the subject matter of the investigation. Pursuant to *Bradshaw*, the defendant must initiate communication concerning the

investigation in order to avoid running afoul of the rule articulated in *Edwards*.[11]

We hold that Heintzelman's questioning of defendant violated the *Edwards* rule, as clarified in *Bradshaw*.[12] Even solely reviewing Heintzelman's testimony regarding his conversation with defendant, there is no proof evincing a desire on the part of defendant to pursue a discussion relating directly or indirectly to the investigation. Defendant merely initiated a social visit with his old friend and neighbor. It was Heintzelman, not defendant, who initiated all questioning relating to the investigation and charges against defendant for the murder of Randy Laufer.

In fact, Heintzelman testified that he tried at least *four separate times* to initiate questioning regarding the investigation: (1) he initially volunteered that defendant's son was also incarcerated, but defendant did not respond; (2) Heintzelman expressly asked defendant if

---

[11] Further, even if a defendant initiates a conversation related to the investigation, the state must still establish that the defendant made a voluntary, knowing, and intelligent waiver of his right to have counsel present at questioning under the totality of the circumstances. *Bradshaw* at 1046.

[12] Indeed, the people conceded at oral argument that if Heintzelman was a state actor, the admission of defendant's statements to Heintzelman violated defendant's Sixth Amendment rights.

he did what he was charged with, and again defendant did not respond; (3) Heintzelman told defendant that the police thought defendant's son was involved in the murder, at which point defendant responded that "if they try to pin it on [my son], I'll let 'em fry my ass"; and (4) Heintzelman again expressly asked defendant if he committed the murder, and defendant responded "Dean, it was bad. It was bad." Thus, not only did defendant not demonstrate any desire to talk about the subject of the investigation, he failed or refused to answer Heintzelman's first two questions regarding the murder. It was only when Heintzelman continued to press defendant that defendant finally answered. Because defendant did not demonstrate a desire to discuss matters directly or indirectly related to the investigation, Heintzelman's questioning was in violation of defendant's Sixth Amendment rights.[13]

CONCLUSION

We hold that Heintzelman was a state actor and deliberately elicited incriminating statements from defendant in violation of the bright-line rule, established

---

[13] We clarify that we do not hold, as the dissent suggests, that a sheriff's reserve deputy may *never* ask a friend about a crime without running afoul of the Sixth Amendment. Rather, we hold only that if, at the time of the questioning, that sheriff's reserve deputy is a state actor and questions the defendant in violation of the *Edwards* rule as clarified in *Bradshaw*, that questioning violates the Sixth Amendment.

15

in *Edwards* and clarified in *Bradshaw*, that protects a defendant against any subsequent government-initiated questioning following the exercise of the defendant's Sixth Amendment rights. Heintzelman both possessed actual state authority and purported to act under that authority; therefore, his action is considered state action. Although defendant may have asked to speak with Heintzelman, at no point did defendant express a desire to discuss subjects directly or indirectly related to the investigation. Therefore, defendant's statements in response to Heintzelman's questioning regarding the murder should not have been admitted at trial. We have already determined that the error was not harmless beyond a reasonable doubt; therefore, we reverse the decision of the Court of Appeals and remand for a new trial.

> Maura D. Corrigan
> Michael F. Cavanagh
> Marilyn Kelly
> Clifford W. Taylor
> Robert P. Young, Jr.

16

# S T A T E   O F   M I C H I G A N

## SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

    Plaintiff-Appellee,

v                                   No. 121300

JOHN RODNEY MCRAE,

    Defendant-Appellant.

_____

MARKMAN, J. (*dissenting*).

I respectfully dissent. The majority is reversing defendant's conviction of first-degree murder on the ground that the trial court erred in admitting a statement that defendant made to Dean Heintzelman, defendant's former neighbor and friend, who happens to volunteer as a part-time, reserve police officer. Specifically, the majority concludes that this admission violated defendant's Sixth Amendment right to counsel. I strongly disagree. In my judgment, defendant's Sixth Amendment right to counsel was not violated because, when Heintzelman spoke to defendant, he was acting as a friend, not as a police officer. Thus, there was no governmental action and, therefore, no violation of defendant's Sixth Amendment right to counsel. Accordingly, I would affirm the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

Defendant was arrested and charged with first-degree murder. The police advised defendant of his *Miranda*[1] rights, and defendant told the police that he did not wish to answer any questions without his attorney present. While defendant was incarcerated awaiting trial, he requested a visit from his former neighbor and friend, Dean Heintzelman. Heintzelman owns an excavating company and in his spare time volunteers as a part-time, reserve officer.[2] According to Heintzelman, the visit began by defendant talking about and showing Heintzelman pictures of his son and his son's wife and baby.[3] At some point, Heintzelman asked defendant whether he committed the murder with which he was charged. Defendant did not answer. After further conversation, Heintzelman again asked defendant if he was involved in the murder. Defendant hung his head and said, "It was bad, Dean. It was bad."

Defendant brought a motion to suppress Heintzelman's testimony regarding this statement, alleging that the

---

[1] *Miranda v Arizona*, 385 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[2] When defendant initially requested this visit, he did not know that Heintzelman was a reserve police officer. However, Heintzelman had just finished transporting a prisoner before he came to visit defendant and, thus, was wearing his police uniform during his visit with defendant.

[3] An inmate who was present during this visit also testified that defendant and Heintzelman's conversation began with defendant talking about his family.

2

statement was obtained in violation of his Fifth Amendment right to be free from compelled self-incrimination and his Sixth Amendment right to counsel. The trial court denied defendant's motion to suppress. Following a jury trial, defendant was convicted of first-degree murder. The Court of Appeals affirmed, concluding that, even if the admission of the statement was error, it was harmless error.[4] This Court then vacated the Court of Appeals judgment in part, concluding that, if there was error, the error was not harmless beyond a reasonable doubt.[5] On remand, the Court of Appeals again affirmed, concluding that the trial court did not abuse its discretion in admitting the statement.[6]

## II. STANDARD OF REVIEW

Constitutional issues are reviewed de novo, while findings of fact are reviewed for clear error. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). "The decision whether to admit evidence is within the trial court's discretion and will not be disturbed absent an abuse of that discretion." *People v McDaniel*, 469 Mich 409, 412; 670 NW2d 659 (2003).

---

[4] Unpublished opinion per curiam, issued January 12, 2001 (Docket No. 217052).

[5] 465 Mich 874 (2001).

[6] Unpublished opinion per curiam, issued February 12, 2002 (Docket No. 217052).

3

III. ANALYSIS

After a defendant has been indicted, his Sixth Amendment right to assistance of counsel attaches. *Massiah v United States*, 377 US 201, 206; 84 S Ct 1199; 12 L Ed 2d 246 (1964).[7] Accordingly, a defendant's incriminating statements, deliberately elicited by governmental agents after the defendant has been indicted and in the absence of defendant's counsel, are not admissible at trial unless the defendant himself initiated the conversation concerning the investigation with the governmental agents. *Michigan v Jackson*, 475 US 625; 106 S Ct 1404; 89 L Ed 2d 631 (1986). The Sixth Amendment right to counsel is broader than the Fifth Amendment right to counsel in the sense that the Sixth Amendment provides a right to counsel beyond custodial interrogations. *Fellers v United States*, 540 US ___; 124 S Ct 1019; 157 L Ed 2d 1016 (2004).

However, "[c]onstitutional protections apply to governmental action only . . . ." *Grand Rapids v Impens*, 414 Mich 667, 673; 327 NW2d 278 (1982). Therefore, one acting as a private individual, rather than as a governmental actor, cannot violate an accused's Sixth Amendment right to counsel. Further, merely because a

---

[7] "In all criminal prosecutions, the accused shall enjoy the right to . . . have the Assistance of counsel for his defense." US Const, Am VI. See also Const 1963, art 1, § 20.

4

person may, in some instances, be considered a governmental actor, does not mean that this person is always a governmental actor.  See *Polk Co v Dodson*, 454 US 312, 324-325; 102 S Ct 445; 70 L Ed 2d 509 (1981)(although a public defender is considered a state actor when performing some official duties, he is considered a private actor when he is representing a criminal defendant).  Accordingly, not every act performed by an individual who happens to be a police officer constitutes state action.  See, e.g., *Barna v Perth Amboy*, 42 F3d 809, 817 (CA 3, 1994)(an off-duty police officer who used his night stick in a fight was not a state actor); *Bonsignore v City of New York*, 683 F2d 635, 638-639 (CA 2, 1982)(an off-duty police officer's use of a police revolver to shoot his wife was not state action); *Delcambre v Delcambre*, 635 F2d 407, 408 (CA 5, 1981)(an on-duty police officer's assault of the plaintiff at a police station was not state action because it arose out of a personal dispute and the officer neither arrested nor threatened to arrest the plaintiff); *United States v McGreevy*, 652 F2d 849, 851 (CA 9, 1981)(a police officer who opened a package while working for Federal Express was not a state actor).[8]

---

[8] The majority observes that all the cases that I cite are distinguishable from the instant case.  If, by this observation, the majority means that none of these cases

5

In *United States v Gaddy*, 894 F2d 1307 (CA 11, 1990), the defendant's aunt, who happened to be a police officer, persuaded the defendant to confess to the police. The United States Court of Appeals for the Eleventh Circuit concluded that she was acting as the defendant's aunt, not as a state actor, because she was not part of the investigative team on her nephew's case, she was not directed by a superior to contact her nephew, there was no evidence that she was acting in the normal course of her duties when she initiated contact with her nephew, and she

involves a former neighbor and friend who happens also to be a part-time, volunteer, reserve police officer, then I agree. However, the majority has likewise failed to cite any case in support of its own conclusions that involves a former neighbor and friend who happens also to be a part-time, volunteer, reserve police officer. The majority's response to this dissent constitutes nothing more than a recognition that the circumstances of the instant case are unusual ones. What the cases that I cite *do* stand for is the proposition that not everything that a person who is a police officer does constitutes state action.

The majority further criticizes some of these cases on the ground that they address whether conduct constitutes state action for the purpose of 42 USC 1983, while the issue here is whether Heintzelman's conduct constitutes state action for the purpose of the Sixth Amendment. However, the United States Supreme Court has stated that, if conduct constitutes state action for the purpose of the Constitution, it necessarily constitutes state action for the purpose of § 1983. *Brentwood Academy v Tennessee Secondary School Auth Assoc*, 531 US 288, 295 n 2; 121 S Ct 924; 148 L Ed 2d 807 (2001). Contrary to the majority's contention, the United States Supreme Court has held that the opposite is also true. *Nat'l Collegiate Athletic Ass'n v Tarkanian*, 488 US 179, 182 n 4; 109 S Ct 454; 102 L Ed 2d 469 (1988)("the under-color-of-law requirement of 42 U.S.C. § 1983 and the state-action requirement of the Fourteenth amendment are equivalent").

6

made no written report following her communication with her nephew.[9]

The facts of the instant case are similar, but even more compelling. Heintzelman was not acting in the normal course of his duties when he talked with defendant—his normal duties included transporting prisoners, not questioning them; Heintzelman's duties as a part-time, reserve police officer were entirely noninvestigative in nature;[10] Heintzelman was not part of the investigative team on defendant's case;[11] Heintzelman was not directed by a superior or anyone else to contact defendant; Heintzelman was requested by defendant himself to speak with him; Heintzelman was not acting under the direction of the investigating police officers; Heintzelman was not acting in concert with the investigating police officers;

---

[9] The Georgia Supreme Court looked at these same factors in concluding that the defendant's father, who happened to be an FBI agent, acted as a father, not as a state actor, when he asked his son if he had shot the victim. *Cook v Georgia*, 270 Ga 820; 514 SE 2d 657 (1999).

[10] When asked what his duties as a reserve police officer included, Heintzelman responded: "I go on transport, transport prisoners. We take care of ball games, do security at ball games. We help with visitation at the jail. That sort of stuff."

[11] Although, as the majority states, Heintzelman "*was* part of the police team present for the recovery of the victim's body from defendant's former residence," *ante* at 10-11, he was there, not in any sort of investigative capacity, but simply as a volunteer to help guard the scene until the state police forensic team arrived.

7

Heintzelman asked no follow-up questions of defendant as would have any other minimally trained investigative officer; and Heintzelman made no written report following his conversation with defendant.[12]

The majority cites *Griffin v Maryland*, 378 US 130, 135; 84 S Ct 1770; 12 L Ed 2d 754 (1964), for the proposition that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action." I agree that whether Heintzelman purported to act under state authority is the dispositive question.

In *Griffin*, an amusement park employee identified himself as a deputy sheriff and ordered the petitioners to leave the amusement park. By identifying himself as a state officer and ordering the petitioners to leave the park, he clearly purported to act under state authority and, thus, his action was effectively state action.

Unlike the officer in *Griffin,* Heintzelman did not purport to act under state authority. Rather, he purported to do nothing more than act as a friend. He came to see

---

[12] Although the prosecutor further asserted at oral argument that Heintzelman did not report anything about his conversation with defendant to the investigating officers until nearly a week after it occurred, I can find no confirmation of this fact in the record. However, the record is similarly bereft of evidence that this conversation was promptly reported to the investigating officers.

defendant at defendant's request, he spoke to defendant about their families, and he asked defendant, as a friend might do when his friend has been accused of murder, what was going on. Further evidence that Heintzelman was acting as a friend, not as a police officer, is that when Heintzelman asked defendant if he was involved and defendant said, "Dean, it was bad," rather than pressing defendant for further evidence of guilt, as anyone acting as a police officer would certainly do, he simply left. Heintzelman behaved, not as a police officer would, but as a disappointed friend would when confronted with an incriminating statement made by one's friend concerning a heinous murder.[13]

The majority's conclusion that Heintzelman acted as a state actor when he spoke with defendant is based entirely

---

[13] The majority states that the fact that *after* Heintzelman was confronted with defendant's incriminating statement, he "offered to obtain more information" from defendant evidences that Heintzelman was acting, not as a friend, but as a state actor when he spoke with defendant. *Ante* at 10. If Heintzelman had, in fact, spoken with defendant as he offered to do, this would certainly be relevant in determining whether the subsequent conversation with defendant constituted state action. However, the fact that Heintzelman, *after* being confronted with defendant's incriminating statement, decided that he would be willing to speak to defendant in order to help the investigating officers, sheds no light on whether Heintzelman went to see defendant in the first place as a governmental agent or as a friend. Indeed, if anything, Heintzelman's offer of future assistance to the officers implies that his initial conversation with defendant had a different purpose.

on the fact that Heintzelman served as a part-time, reserve police officer, and that when he spoke with defendant it was late at night and he was wearing a police uniform. As explained above, not everything a police officer does, regardless of when it is done and regardless of the circumstances under which it is done, constitutes state action. Not even everything a police officer, who happens to be uniformed, does constitutes state action. That Heintzelman happened to be wearing a uniform when he spoke with defendant does not transform Heintzelman's personal actions into state actions.[14] Likewise, the fact that their conversation took place after normal visiting hours does not transform Heintzelman's personal conversation with defendant into state action.[15]

---

[14] Heintzelman was wearing a uniform, not because he was attempting to intimidate defendant, or to communicate his public authority, but because he came to visit defendant at defendant's request at a time when he happened to be in uniform.

[15] Heintzelman visited defendant at around 11:00 P.M., not because he was attempting to catch defendant off guard, but because he happened to be at the jail where defendant was incarcerated at that time since he had just finished transporting a prisoner there. The majority states that the fact that their conversation took place so late is relevant because only governmental agents would have had access to defendant at that time of night. However, that this conversation took place several hours before or after normal visiting hours does not transform this private conversation into state action. That the police officer in *Barna* only had access to a police-issued night stick because he was a police officer, did not make his use of

10

Apparently, the majority would have no problem admitting defendant's statement to Heintzelman if Heintzelman had first gone home, changed his clothes, and come back the next morning to speak with defendant. However, in my judgment, it is difficult to comprehend the significance the majority gives these factors in determining whether a jury will or will not have access to defendant's statement.

## IV. CONCLUSION

The majority has concluded that someone who happens to have volunteered as a part-time, reserve police officer cannot ask a friend about a crime with which he has been charged without running afoul of the Sixth Amendment.[16] As a result, a clearly incriminating statement made about a brutal murder—a statement made voluntarily and fully in

---

this night stick in a fight state action, just as the fact that the officer in *Bonsignore* only had access to a police-issued revolver because he was a police officer did not make his use of this revolver to shoot his wife state action.

[16] The majority rejects this characterization of its holding, and replies that it is merely concluding that a part-time, reserve police officer can never ask a friend about a crime only while acting as a state actor. Of course, such a reply is a mere tautology since the very issue before this Court is whether Heintzelman was a state actor. The majority's references to *Edwards* and *Bradshaw* are similarly circular. To repeat, under the majority's analysis, a part-time, reserve police officer would not be able to ask a friend about a crime with which he has been charged without running afoul of the Sixth Amendment.

11

compliance with the requirements of *Miranda v Arizona*[17]—is to be excluded from the justice system.  And defendant's jury of peers—tasked with carrying out one of the gravest responsibilities of citizens in a democracy, determining the truth of a criminal charge—will be required to carry out this responsibility while being deprived of a compelling piece of evidence, freely given words from defendant's own mouth.

When all the facts are considered, it is clear that Heintzelman spoke to defendant as a friend, not as a governmental actor and, thus, Heintzelman could not have violated defendant's Sixth Amendment right to counsel. Therefore, I would affirm the judgment of the Court of Appeals.

Stephen J. Markman
Elizabeth A. Weaver

---

[17] By stating that there was no *Miranda* violation, I am not implying that compliance with *Miranda* was required. Indeed, for the same reason that I conclude that defendant's Sixth Amendment right to counsel was not violated—there was simply no state action—I would also conclude that his Fifth Amendment right was not violated. The reference to *Miranda* is simply to underscore the utter lack of coercion surrounding the statement that the majority is suppressing.