# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
December 7, 2011 Session

## STATE OF TENNESSEE v. KENDELL EDWARD JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No. 2008-D-3883   J. Randall Wyatt, Jr.**

---

**No. M2011-00792-CCA-R3-CD - Filed August 29, 2012**

---

The Defendant, Kendell Edward Johnson, appeals from his jury conviction for second degree murder, for which he received a fifteen-year sentence. In this direct appeal, the Defendant argues (1) that the trial court erred by admitting the redacted recording of a conversation between the Defendant and his father made at the police station following the Defendant's arrest on an unrelated charge, (2) that the trial court erred by permitting the irrelevant testimony of the victim's brother, and (3) that the evidence was insufficient to support his conviction. After a thorough review of the record and the applicable authorities, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Anne M. Davenport, Nashville, Tennessee, for the appellant, Kendell Edward Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante and Benjamin J. Ford, III, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

On June 17, 2008, Hassan Osman ("the victim") was shot twice while attempting to enter his apartment on Lenore Street. Thereafter, the Defendant was charged in Davidson County Juvenile Court with killing the victim. He was transferred to criminal court to be tried as an adult and was indicted for first degree premeditated murder, first degree felony

murder, and attempted aggravated robbery. The indictment was later amended by dismissal of the premeditated murder charge and renumbering of the remaining counts.

At trial, the State first called the victim's brother, Noordin Osman, to testify. Mr. Osman testified that he and his brother were originally from Somalia and that his brother had been living in the United States for approximately three years. The brothers lived together in an apartment on Lenore Street. At the time of the victim's death, the victim was working as a cab driver. Mr. Osman then described the victim's usual routine for the jury. According to Mr. Osman, if the victim worked in the morning, he typically would get off around 8:00 p.m. Sometimes before coming home from work, the victim would either stop at the mosque to pray or get something to eat before coming home. Mr. Osman was not home on the night of the victim's murder. He identified pictures of the victim and the victim's taxicab.

Next to testify was Officer Ronald Lewis Bright with the Central Precinct Motorcycle Unit of the Metropolitan Nashville Police Department ("Metro"). At approximately 10:22 p.m., on June 17, 2008, Officer Bright was in a gas station parking lot on Shelby Avenue, accompanied by Officer Mark Woodfin, and the two were taking a break to cool off their motorcycles. Both officers heard gunshots in the distance from the Casey Homes area, close to Lenore Street. Soon afterwards, a Somalian taxicab driver pulled into the parking lot; "[t]he driver was really hysterical[,] waiving his cell phone." After getting the man to calm down, he told them that he had been trying to call 911 but could not get an answer. Understanding that someone had been shot, they phoned dispatch and followed the man to "an apartment area" on Lenore Street. Officer Woodfin estimated that they arrived on Lenore Street within three to five minutes after hearing the gunshots.

Upon arrival at the apartment, Officer Bright observed "a group of people . . . screaming hysterical[ly]" and a black male lying on the porch with an apparent wound to the chest. Officer Bright went to check on the victim's condition and saw that his keys were still in the front door. According to Officer Bright, the man "took a couple more breaths and at that point . . . , he expired."

They called for an ambulance and assistance from the East Precinct. They then secured the scene while "other units start[ed] arriving, Flex units, patrol, and detectives." Autopsy results revealed that the victim suffered two close-range gunshot wounds to his torso and that the manner of death was homicide.

Seventeen-year-old Antwain Kelly, also known as "Twan," testified that he had been friends with the Defendant since sixth grade. According to Kelly, the Defendant stopped by Kelly's house around 7:00 or 8:00 p.m. on June 17, 2008; it was already dark outside. While they talked, the Defendant told Kelly that "[h]is daddy and some dude got into it over

something." The conversation ended because Kelly's mother called Kelly to come back inside the house. According to Kelly, he saw the Defendant approximately ten to fifteen minutes later coming from the direction of Lenore Street. He was walking "[l]ike a regular person." The Defendant said, "I shot the n----r," and he walked off. However, Kelly testified that he did not take the Defendant seriously; they often "kidded around with each other like that." About fifteen or twenty minutes after he saw the Defendant for the second time, Kelly saw an ambulance and heard helicopters.

Kelly's mother observed her son speaking with the Defendant outside her home on the evening of June 17, 2008. Because she "figured something was getting ready to go down," she called her son to come back inside. After a few minutes, she saw the Defendant walk up the sidewalk in the direction of Lenore Street. Judging by the way the Defendant was "fumbling" with his pants, Kelly's mother believed that the Defendant was armed. Later that evening, she saw an ambulance pass by her house.

Jerome Holt, who was twenty years old at the time of the Defendant's trial, stated that he had "been hanging around with" the Defendant for about a week and a half during the month of June in 2008. Shortly following that week-and-half period, the Defendant came to visit Holt and told him that he had shot somebody. According to Holt, the Defendant was out of breath, like he had been running, and seemed "confused" when he told him about the shooting. The Defendant then offered to sell Holt a gun, but Holt declined the offer.

Metro Detective William Stewart testified that he was called to the Lenore Street murder scene on June 17, 2008; he was assigned as the lead detective to investigate the victim's murder. Detective Stewart arrived on the scene at approximately 11:00 p.m. that evening. Upon his arrival, he spoke with the other officers and detectives already on the scene, interviewed neighbors, and ensured that the "ID officer . . . knew what items needed to be collected." They collected several items belonging to the victim, including a car remote, a cellular telephone, a set of keys, and a "Garmin GPS system." Detective Stewart stated that another officer removed the victim's wallet from his front pocket; Det. Stewart confirmed that the wallet had $120 inside and "all of the other stuff you generally find in someone's wallet."

In the days that followed, Det. Stewart and other detectives spoke with a lot of individuals in effort to gather information about the murder and receive tips about who might have been involved. Based on a tip, Det. Stewart went to CeeBee store on Shelby Avenue and spoke with Cecil Johnson, the Defendant's father. Mr. Johnson was cooperative, providing Det. Stewart with information pertinent to the investigation.

Thereafter, Det. Stewart arrested the fifteen-year-old Defendant on an unrelated burglary charge on June 26, 2008, and transported him to the police station for questioning. The Defendant was a suspect in the victim's murder at the time of his arrest. The Defendant was placed in an interview room, and the interview began shortly after 10:00 a.m. The Defendant was advised of his Miranda rights, and beyond providing statistical information, declined to participate in the interrogation. According to Det. Stewart, he did not inform the Defendant at any time about whether they had located a murder weapon.

After declining to speak with the detectives, the Defendant was permitted to speak with his father alone at the station. The conversation was recorded, which according to Det. Stewart, was routine procedure. The Defendant made statements during this conversation evidencing knowledge that there was a gun involved in the murder, which the police had not found, that the gun needed to remain hidden so the police could not prove he did it, and that there were no witnesses to the crime.

Based on his investigation, Det. Stewart believed that there was a shooter and two other individuals involved in the victim's murder. Despite his efforts, Det. Stewart was never able to locate the murder weapon. He had not arrested anyone other than the Defendant in relation to the murder, although he had interviewed several other suspected individuals, including Jerome Holt. Detective Stewart testified that Holt told him that the Defendant said a cab driver had been shot, that the cab driver had been shot multiple times, and that the Defendant was "breathing hard" when he said this. Holt also said to Det. Stewart that he did not see a gun when the Defendant visited him.

Prior to trial, the Defendant filed a motion to suppress the recording of the Defendant's conversation with his father. However, the State was permitted to introduce a redacted recording of this conversation at trial. Moreover, the Defendant's father was present at trial but was not called to testify. The trial court instructed the jury that the Defendant's father's statements in the recording were "admissible only as they provide meaning to the statements made by . . . the Defendant . . . ."

Following the conclusion of proof, the Defendant was convicted of the lesser-included offense of second degree murder and acquitted of attempted aggravated robbery. The trial court imposed a sentence of fifteen years at 100% as a Range I, standard offender to be served in the Department of Correction. This timely appealed followed.

## ANALYSIS

On appeal, the Defendant raises three issues for our review: (1) whether the trial court properly admitted the redacted recording of the Defendant's conversation with his father; (2)

whether the trial court erred in admitting the testimony of the victim's brother; and (3) whether the evidence was sufficient to support his conviction for second degree murder. We will address each in turn.

*I. Motion to Suppress*

On June 8, 2010, the Defendant filed a motion to suppress requesting "suppression of the custodial interview of him when he was arrested for unrelated burglary charges on June 26, 2008." The Defendant asserted that when Det. Stewart informed him of his right to remain silent, he "clearly indicated he did not want to speak to police." According to the Defendant, the police ignored his assertion of his right to remain silent and continued to interrogate him in violation of his Fifth Amendment rights as outlined in Miranda v. Arizona, 384 U.S. 436 (1966), and as clarified in Rhode Island v. Innis, 446 U.S. 291 (1980). As a result of this continued questioning, the Defendant requested to speak with his father, which conversation was likewise recorded. The Defendant contended that the "illegally obtained statements are 'fruit of the poisonous tree' and are not legally admissible against him. Wong Sun v. United States, 371 U.S. 471 (1963)."

The State filed a response, clarifying that it only sought admission of the conversations the Defendant had with his father and not of any statements made to the detectives. The State rationalized that because it was not seeking to introduce the statements made to the detectives, the Defendant's reliance on Miranda and Innis was misplaced. According to the State, the appropriate inquiry involved a Fourth Amendment analysis pursuant to Smith v. Maryland, 442 U.S. 735, 740 (1975): (1) whether the Defendant had an actual subjective expectation of privacy and (2) whether society is willing to view that subjective expectation of privacy as reasonable and justifiable under the circumstances. The State contended that, applying this test to the present case, "there is no question that the statement is admissible under the constitution." First, the State submitted that the Defendant did not have a subjective belief that he was speaking privately with his father, noting the Defendant's statement during the exchange, "Shouldn't be talking about that. Been crazy. Cameras." Second, the State cited to State v. Munn, 56 S.W.3d 486 (Tenn. 2001), for the proposition that there were no misleading actions or statements by the detectives indicating that the conversations would be private and, therefore, any expectation of privacy in the police interrogation room was not reasonable under the circumstances. The State proposed to redact portions of the transcript where the conversation involved the unrelated burglary charges.

On appeal, the Defendant advances several arguments that the trial court should have suppressed the videotaped conversation between him and his father at the police station. The Defendant raises two constitutional issues: first, arguing that his Miranda rights were violated when the conversation with his father was recorded after he invoked his right to remain

silent, and second, that his confrontation rights were violated because his father's statements were testimonial hearsay, and he was not permitted an opportunity to cross-examine his father at trial.

Initially, the State notes that if an order was entered denying the motion to suppress, it is not a part of the appellate record. However, the State further notes that the trial court refers to and summarizes its prior findings concerning the suppression motion in the order denying the motion for a new trial and, moreover, that the trial court made detailed oral findings on the redaction issue. Possible waiver notwithstanding, the State responds that the trial court properly admitted the redacted recording of the Defendant's conversation with his father, separately addressing each of the bases the Defendant relies upon for exclusion of the videotape.

*A. Motion to Suppress Hearing*

At the motion to suppress hearing, Det. Stewart confirmed that he arrested the Defendant on June 26, 2008, on unrelated burglary charges, that the Defendant was a suspect in the victim's murder at that time, and that the Defendant was transported to the police station for questioning. Detective Stewart testified that he had been in contact with the Defendant's father, Cecil Johnson ("Mr. Johnson"), prior to the Defendant's arrest. He requested Mr. Johnson's help in locating his son, informing Mr. Johnson that they "were interested" in the Defendant for both the burglaries and the murder. Detective Stewart described Mr. Johnson as "very cooperative."

Detective Stewart verified that there was a recording of the Defendant's interview conducted at the police station. He agreed that the recording showed that at one point during the interview, the Defendant asked to speak with his father. Detective Stewart "had some trouble locating" Mr. Johnson but was eventually able to do so, and Mr. Johnson came to the station. According to Det. Stewart, he informed Mr. Johnson that the Defendant wanted to speak to him, escorted Mr. Johnson to the interview room, and allowed the two men to speak unsupervised. Detective Stewart confirmed that he did not give Mr. Johnson any instructions about what questions to ask the Defendant. According to Det. Stewart, he did not indicate to the Defendant that the conversation would be un-recorded or private. Detective Stewart did not mention the cameras in the interview room.

While Det. Stewart did not recall Mr. Johnson leaving the room during the interview and then returning to talk to his son some more, he acknowledged that those events had taken place because he had "read the dialogue" from the transcript. Detective Stewart asserted that, during that time when Mr. Johnson was outside of the room, he would not have instructed Mr. Johnson to ask any specific questions of his son.

Detective Stewart could not remember if he ever discussed the fact that the murder weapon had not been found with the Defendant; however, he did not "believe" that he relayed that information to the Defendant, noting that he "may have told [the Defendant's] father."[1] Other than what was portrayed on the videotape, Det. Stewart did not have any other conversations with the Defendant wherein he reviewed the evidence with the Defendant.

On cross-examination, Det. Stewart acknowledged that he had reviewed a partial transcript before the hearing. He also confirmed that he visited the Defendant's father's place of work on June 25, 2008, the day before the Defendant's interview. According to Det. Stewart, Mr. Johnson rode with him for about an hour and a half that day and took him to three different locations—the Defendant's mother's residence, the Defendant's primary residence; Antwain Kelly's residence; and Daniel Bigsby's home, where the Defendant sometimes stayed. The Defendant also stayed with his father on weekends. Detective Stewart testified, "It became my understanding that he stayed just about wherever he wanted to any night."

Based upon the information he received from Mr. Johnson and some information from other sources, Det. Stewart then interviewed Antwain Kelly later on the 25th. The Defendant was arrested the following day, June 26. When asked about the substance of his conversation with the Defendant during the car ride to the police station, Det. Stewart replied, "Well, I recall that at his mother's house there was a marijuana plant up in the closet[,] and we talked about that, specifically I think we talked about girls or something, a girlfriend." Detective Stewart agreed that it was "very likely" he told the Defendant during the car ride that he had spoken with his father.

Defense counsel then reviewed pertinent portions of the interview with Det. Stewart. After reviewing those excerpts, defense counsel asked, "Well, what was the point of all that. It is long and [the Defendant] has already told you that he didn't want to talk to you. . . . Do you agree that you were trying to get him to talk?" Detective Stewart agreed that he was "trying to get" the Defendant to talk.

Detective Stewart confirmed that he took the Defendant to juvenile court on the burglary charges following the June 26, 2008 interview. The Defendant was released from custody on those charges. Thereafter, the Defendant was arrested at his home on July 9, 2008, for the victim's murder. Detective Stewart testified at the Defendant's detention hearing in juvenile court a few days after the July 9, 2008 arrest. At that hearing, Det.

---

[1] At trial, Det. Stewart affirmatively testified that he did not tell the Defendant that they had been unable to locate the murder weapon.

Stewart testified that he asked the Defendant about any involvement in the victim's murder and that the Defendant denied he was involved. Detective Stewart further provided at that hearing that the Defendant provided "nothing incriminating" during the interview.

Detective Stewart admitted that he did not arrest the Defendant based upon the statements he made in the interview room. According to Detective Stewart, an arrest in a murder case usually required the approval of a supervisor or someone in the district attorney's office "[u]nless it is right there on the scene and the murder weapon in hand and he is telling you he did it[.]"

Detective Stewart agreed that the law allowed police to question a juvenile without the presence of a parent. According to Det. Stewart, most of the time, juveniles were questioned without their parents.

Detective Stewart confirmed that he interviewed Jerome Holt on July 3, 2008, before he arrested the Defendant for the victim's murder. He provided, "I was still gathering evidence at that point and still had people to talk to, so no, at that point I did not make an arrest."

After hearing arguments from counsel, the trial court stated it would take the matter under advisement and would enter a written order prior to trial. There is no order denying the motion to suppress contained in the record on appeal. The burden is on the appellant to provide a record of the prior proceedings that will allow for meaningful review in this court. See Tenn. R. App. P. 24(b). However, the trial court made a detailed oral ruling on the redaction issue and made extensive findings on the suppression issues in the order denying the Defendant's motion for a new trial. This will suffice for review of the issues presented.

### B. Videotape

The following facts are evident from our review of the videotape.[2] The first detective[3] entered the room at 2:28[4] on the videotape and immediately removed the Defendant's handcuffs. The two men engaged in casual conversation until Det. Stewart entered the room at 5:45 on the tape. At approximately 6:30, Det. Stewart informed the Defendant that this

---

[2] We provide the following factual account without the benefit of a transcript of the first portion of the videotape involving the conversation between the Defendant and the detectives, although a transcript of this exchange appears to have been utilized at the motion hearing.

[3] This detective's name is not readily apparent from the record.

[4] As previously noted, the interview began shortly after 10:00 a.m. The counter on the videotape begins at 0:00, and the time references in this opinion are from the time elapsed on the video counter.

was an "official" meeting and that he would be re-advised of his <u>Miranda</u> rights. They then reviewed statistical information with the Defendant, such as the time and date and the Defendant's name, address, grade, phone number, date of birth, social security number, and school.

At 9:35 on the tape, Det. Stewart provided a <u>Miranda</u> waiver form to the Defendant so that the Defendant could follow along and initial as the detective read the rights. First, Det. Stewart informed the Defendant of his right to remain silent, and the Defendant answered affirmatively that the understood that right and initialed the form accordingly. Next, the detective asked the Defendant if he wished to waive that right and speak with them. The Defendant shook his head from side to side negatively and made a negative verbal response, shown at 10:31 on the videotape. Detective Stewart then asked, "You don't want to talk to us?" The Defendant again shook his head giving a negative response. Detective Stewart queried, "You don't?" The Defendant indicated "no" that he was "trying to get class." Detective Stewart then informed the Defendant that if time was the issue, the "bottom-line" was that the Defendant was going to jail whether he talked with the detectives or not and that he was going to miss class that day. The Defendant again shook his head in a negative manner.

Detective Stewart continued questioning the Defendant, noting that the Defendant talked on the car ride over to the police station after being read his <u>Miranda</u> rights, and then asking the Defendant what was different now. The Defendant replied, "I ain't got time to be going through all this." Detective Stewart asked, "What do you mean you don't have time?" The Defendant responded "'cuz, man." Detective Stewart then noted the Defendant's youth and stated that he had "all kinds of time."

At 11:52 on the videotape, the other detective then said, "Let me ask you this, okay? We told you were under arrest. Did we not? Never told you what you're under arrest for." Detective Stewart then asked, "Do you know?" The Defendant shook his head negatively. The other detective then asked if he was "just gonna take [his] word for it" and not even ask what the charges were. Detective Stewart informed the Defendant that he was under arrest for several car burglaries and then asked, "You thought it was something else, didn't you?" Detective Stewart discussed the evidence from the car burglaries and showed the Defendant copies of fingerprints lifted from inside several of the vehicles, fingerprints matching both the Defendant's and Jerome Holt's. Detective Stewart then said, "You kinda of threw me for a loop there, when you were like 'no,' I ain't got time."

Detective Stewart then relayed to the Defendant that the conversation would be just like it was "on the way over" to the police station and that the Defendant would be treated respectfully. The Defendant asked if they knew where Holt was, to which Det. Stewart

responded that he did not but possibly hoped the Defendant could provide that information. Detective Stewart informed the Defendant that he could not answer any of the Defendant's questions if the Defendant did not want to talk to them. Detective Stewart pointed out that the Defendant could stop the interview if he chose to do so, noting the correspondent section on the Miranda form. Detective Stewart stated that "this ain't no trap" or "trick."

At 15:35 on the videotape, Det. Stewart asked, "I told you I talked to your daddy, right?" followed by, "Do you think he would want you to talk to us?" The Defendant replied that he was unsure of what his father would want and stated "that's who I want to talk to." Detective Stewart then said to the Defendant that his father had told him that the Defendant was "a good kid." Detective Stewart queried, "You want to talk to your dad?" The Defendant responded affirmatively. Detective Stewart then informed the Defendant that he had tried to locate his father that morning but had been unable to do so and further relayed that he had spoken with the Defendant's father the day before. Detective Stewart informed the Defendant that, the day before, the Defendant's father rode around with him, showing him the location of certain residences. Detective Stewart opined, "He was cooperating with us, and I think he'd want you to too."

At 17:23 on the tape, Det. Stewart again attempted to review the Defendant's rights with him, trying to get him to waive those rights. In that same vein, he reviewed the whole form with the Defendant before seeking a response to any of the information provided. Detective Stewart stated that "there's nothing trick about that" in reference to the form. At 19:38, Det. Stewart asked the Defendant if he wanted to review the form again, and the Defendant stated, "I'm cool." Detective Stewart asked the Defendant if that meant that he had "changed [his] mind" about speaking with them. The Defendant answered by shaking his head from side to side negatively. Detective Stewart then asked, "You didn't change your mind?" The Defendant again answered in the negative. Detective Stewart asked the Defendant why he was refusing to talk, and the Defendant answered, "'Cuz, I don't just feel like talking." Detective Stewart responded, "I can understand that." At 20:34 on the videotape, the other detective exited the room.

While alone in the room, Det. Stewart continued to talk to the Defendant. He further pressured the Defendant:

> I am going to be honest with you. I have been doing this for seventeen years and you are the very first person who has ever said I just don't feel like talking about it. You are the very first person. You kind of got me going, like, damn, wonder what that is all about? Usually if somebody at first is hesitant or something and they will explain to it or it makes sense to me or, you know, I

understand why they are saying that. I can't honestly say that anybody has ever said . . . I just don't feel like talking.

Detective Stewart then asked the Defendant if he knew what was going to happen to him, and the Defendant replied in the negative. Detective Stewart then received a phone call and exited the interview room at 22:22 on the videotape.

Detective Stewart returned at 26:22 and asked the Defendant for "a good number" to contact his father, which the Defendant provided. He again left the room.

Both detectives reentered the room at 29:31, and Det. Stewart informed the Defendant that his father was on his way to the station to talk with him. Detective Stewart then left, and the other detective filled out paperwork with the Defendant. At 44:08, after finishing the paperwork, he informed the Defendant that he would "call for a transport down to juvenile" after the Defendant was done speaking with his dad. He left the room at 44:32.

At 45:56, Det. Stewart entered the room accompanied by the Defendant's father. Detective Stewart said, "Your dad's here. I'm going to let him talk to you. . . . I'm just going to leave you two alone, okay?" Detective Stewart then left the room.

The Defendant and his father talked. At 51:54 on the videotape, Det. Stewart knocked on the door. After opening the door, Det. Stewart asked, "Y'all good?" The Defendant's father answered affirmatively. Detective Stewart provided, "I just want to make sure we are all on the same page here," noting that the Defendant had "paper on him" for the car burglaries but that they were interested in talking with the Defendant about the "other thing." Detective Stewart wanted to make sure that "there was no confusion" why the Defendant was being questioned. The Defendant's father then started asking general questions to both the Defendant and Det. Stewart. Detective Stewart stated, "Let me just leave y'all alone again" and exited at 52:51.

During the conversation with his father, the Defendant made several statements evidencing knowledge about facts of the murder and the police investigation:

(1) "That's what I'm saying, they putting it out there like I shot somebody because of you. Cause he messed with you.";
(2) "See that's why they think I did it, because the helicopters came and I went around.";
(3) "I didn't do nothing. They got to go to court and prove, prove where the gun at and do everything on me. Do what they got to do. (inaudible). Find some fingerprints.";

-11-

(4) "That's the only person that know my name that I know come out there. They bring Twan here."

(5) "They ain't going to find the gun. They find the gun?"; and

(6) "They didn't see. The only proof they got. They got to find, (inaudible) find the gun and everything to prove that it was me. . . . [T]hat's the only way they prove it."

The Defendant's father said, "So, for your sake I hope nobody find out that you the trigger. That's going to bring you back up here. . . . Hope for that sake we got plenty of chance that these folks don't find what they be looking for." The Defendant replied, "They don't have to find it." The Defendant later stated, "But they, somebody, somebody said that he said, somebody said I got the gun from him. That's totally wrong. They don't even know what's going on out there. People just keep saying stuff about me."

Much of the conversation involved the two men discussing who might be spreading rumors about what happened and talking to the police. Near the end of the conversation, the Defendant's father said, "I hope for your sake you never told nobody what you did with it, because they going to take that in and turn you in. You got to keep it strong about nobody knows where you at." The Defendant responded, "That's how (inaudible) get made [sic] at me. It was crazy. . . . Do what they do. Prove." The Defendant's father then stated, "You and the guy who done it has the proof. I know he know, y'all went to (inaudible) together." The Defendant answered, "Shouldn't be talking about that. Been crazy. Cameras."

*C. Standard of Review*

On review, an appellate court may consider the evidence presented at the suppression hearing as well as at trial in determining whether the trial court properly denied a pretrial motion to suppress. State v. Henning, 975 S.W.2d 290, 297-99 (Tenn. 1998). When the trial court "makes findings of fact in the course of ruling upon a motion to suppress, those findings are binding on appeal unless the evidence in the record preponderates against them." State v. Meeks, 262 S.W.3d 710, 722 (Tenn. 2008). Additionally, a trial court's conclusions of law along with its application of the law to the facts are reviewed de novo without any presumption of correctness. Id. The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from that evidence." State v. Talley, 307 S.W.3d 723, 729 (Tenn. 2010) (quoting State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996)). Questions about "the assessment of witness credibility, the weight and value of evidence, and the resolution of evidentiary conflicts are entrusted to the trial court" as the trier of fact. Meeks, 262 S.W.3d at 722.

-12-

*D. Fifth Amendment*

First, the Defendant contends that his recorded statements should have been suppressed under Miranda v. Arizona, 384 U.S. 436 (1966), because the police obtained these by continuing with efforts to question him after he invoked his Fifth Amendment right to remain silent. Furthermore, citing to Rhode Island v. Innis, 446 U.S. 291 (1980), he asserts that these statements were brought about by police action that was the functional equivalent of interrogation, i.e, that his father was acting as a police agent in securing inculpatory statements about the murder from the Defendant.

The State responds that the trial court correctly found that the Defendant's Miranda rights were not violated and that his father was not acting as a "state agent." The Defendant replies that, while the dictate may not have been express, the Defendant's father "seemed to understand his role in the interrogation." Detective Stewart "[t]elling the two he would leave them alone was calculated to capture statements of investigative value." According to the Defendant, he was subject to the "functional equivalent" of interrogation, and the recording was fruit of the State's improper interrogation of the Defendant.

The Fifth Amendment to the United States Constitution provides, "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. Const. amend. V; see Malloy v. Hogan, 378 U.S. 1, 6 (1964) (holding that the Fifth Amendment's protection against compulsory self-incrimination is applicable to the states through the Fourteenth Amendment). Article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. "The significant difference between these two provisions is that the test of voluntariness for confessions under [a]rticle I, [section] 9 is broader and more protective of individual rights than the test of voluntariness under the Fifth Amendment." State v. Crump, 834 S.W.2d 265, 268 (Tenn. 1992), cert. denied, 506 U.S. 905 (1992).

That a defendant has a constitutional right to remain silent in the face of accusations against him, not only during his trial but also upon arrest and while in custody, is a rule so fundamental as to require little elaboration. Braden v. State, 534 S.W.2d 657, 660 (Tenn. 1976) (citations omitted). When a suspect clearly articulates during custodial interrogation that he wishes to invoke the Fifth Amendment privilege against self-incrimination, the officers conducting the interrogation must stop questioning the suspect. Crump, 834 S.W.2d at 269 (citing Miranda, 384 U.S. at 473-74). Furthermore, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.'" Michigan v. Mosley, 423 U.S. 96, 104 (1975); see also State v. Cameron, 909 S .W.2d 836, 847 (Tenn. Crim. App. 1995). Before the police must scrupulously honor a suspect's right to remain silent, the

suspect must clearly articulate that right so that a reasonable police officer under the circumstances would understand the suspect's words and conduct to mean that the suspect wants to exercise his right to cut off further questioning. State v. William M. Hukowicz, No. M1999-00073-CCA-R9-CD, 2000 WL 1246430 (Tenn. Crim. App. Aug. 18, 2000). In Hukowicz, the defendant, when asked about the night in question, told the detective that he could not comment and, although he wanted to comment, he "knew better." Id. A panel of this court concluded that a reasonable police officer under the circumstances should have known that the defendant was invoking his right to terminate questioning. Id.

In the present case, in addressing the Defendant's Miranda argument, the trial court found as follows:

> The [c]ourt notes that Miranda warnings are only required in situations involving "custodial interrogation." [Miranda, 384 U.S. 436]. The Tennessee Supreme Court has held that "to constitute 'custodial interrogation,' (1) the subject must be 'in custody'; (2) there must be an interrogation; and (3) the interrogation must be conducted by a state agent." State v. Smith, 933 S.W.2d 450 (Tenn. 1996) (citing Miranda, 384 U.S. 436). In this case, the [c]ourt made findings that there was no evidence presented indicating the Defendant's father was acting as an agent of the police. Furthermore, this [c]ourt credited Detective Stewart['s] . . . testimony that he gave no directions to the Defendant's father. The [c]ourt finds that the Defendant's father was not acting as a state agent and the Defendant's Miranda rights were not violated in admitting his statement.

This finding makes no mention of whether the Defendant had previously invoked his right to remain silent or whether that right was "scrupulously honored."

After he invoked this right, the Defendant claims, his interrogation did not cease; instead, Det. Stewart improperly engaged in the functional equivalent by summoning his father to the interview room, where he continued to pressure him about his involvement in the victim's murder. It is clear from our review of the videotape that the Defendant invoked his Fifth Amendment right to remain silent. Therefore, Det. Stewart should have "scrupulously honored" the Defendant's right to remain silent and ceased questioning him, but this did not happen. However, this does not end our inquiry.

The Defendant argues that he was subjected to the "functional equivalent" of interrogation when he spoke with his father because the police knew or should have known that the Defendant's conversation with his father was likely to produce an incriminating response. Additionally, the Defendant argues that the resulting conversation with his father

should have been suppressed as "fruit of the poisonous tree" in accordance with <u>Wong Sun v. United States</u>, 371 U.S. 471 (1963).

One of the questions frequently presented in cases in this area is whether particular police conduct constitutes "interrogation." In <u>Rhode Island v. Innis</u>, the United States Supreme Court held that the rationale of the <u>Miranda</u> decision prohibited not only express questioning by the police, but also its "functional equivalent." 446 U.S. 291, 300-01.

> That is to say, the term 'interrogation' under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

<u>Id.</u> at 301 (footnotes omitted). The Court noted that "[t]he later portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police." <u>Id.</u>

Under certain circumstances, questioning by private third parties has been found to bear the stamp of official authority and, thus, to constitute the functional equivalent of police interrogation. <u>See, e.g.</u>, <u>Estelle v. Smith</u>, 451 U.S. 454, 467 (1981) (questioning by court-appointed competency psychiatrist found to implicate the defendant's <u>Miranda</u> rights); <u>Wilson v. O'Leary</u>, 895 F.2d 378, 380-81 (7th Cir. 1990) (holding <u>Miranda</u> applicable where sheriff detained defendant against his will in a vacant lot so husband of victim could interrogate defendant). Instructive in this regard is the case of <u>Arizona v. Mauro</u>, 481 U.S. 520 (1987). In <u>Mauro</u>, the accused admitted to law enforcement officers that he had just killed his son. He directed the police to the child's body and then stated, after being given his <u>Miranda</u> rights, that he did not want to talk any further without a lawyer. The accused's wife was allowed to meet with him in the presence of an officer who tape-recorded their conversation.

Responding to the definition provided in <u>Innis</u>, that "interrogation" includes a "practice that the police should know is reasonably likely to evoke an incriminating response from a suspect," 446 U.S. at 301, the Arizona Supreme Court determined that the tape was the inadmissible product of an interrogation. The court reasoned that the officers who allowed the meeting between the spouses and tape-recorded their statements admitted they "'knew that if the conversation took place, incriminating statements were likely to be made.'" <u>See Mauro</u>, 481 U.S. at 525 (citing <u>State v. Mauro</u>, 716 P.2d 393, 400 (Ariz. 1986)).

The United States Supreme Court reversed. It held that no "interrogation" had occurred because (1) there was no evidence that Mauro's wife was sent "in to see her

husband for the purpose of eliciting incriminating statements," 481 U.S. at 528; (2) viewing the situation from Mauro's perspective, it was unlikely that Mauro would have felt "that he was being coerced to incriminate himself" by his wife's presence, id.; and (3) the "decision to allow Mauro's wife to see him was [not] the kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," id. at 527 (footnote omitted).  The decision indicates that in the absence of "compelling influences, psychological ploys, or direct questioning," the "possibility" that an accused will incriminate himself, and even the subjective "hope" on the part of the police that he will do so, is not the functional equivalent of interrogation.  Id. at 528-29.  Justice Stevens dissented on the ground that setting up the meeting was a "powerful psychological ploy" because Mauro had insufficient advance warning of his wife's coming to talk to him and because the police "set[] up a confrontation between [the spouses] when [Mauro] manifestly desired to remain silent."  Mauro, 481 U.S. at 531 (Stevens, J., dissenting).

Mauro makes it clear that the subjective motivation of Det. Stewart, who obviously "hoped" the Defendant would incriminate himself in the victim's murder during the conversation with his father or, at the very least, the Defendant's father would convince him to speak with the detectives, does not of itself make the encounter an "interrogation."  Also, as in Mauro, there was no evidence here that the Defendant's father was sent "in to see [the Defendant] for the purpose of eliciting incriminating statements." 481 U.S. at 528.  In fact, the trial court accredited Det. Stewart's testimony to the contrary "that he gave no directions to the Defendant's father."  It does not appear from the record that the police ever asked or directed, or induced or threatened the Defendant's father to get information from the Defendant.  After the Defendant requested to speak with his father, Det. Stewart contacted Mr. Johnson, and he came to the police station.  Upon Mr. Johnson's arrival, Det. Stewart informed him that his son wanted to speak to him, escorted Mr. Johnson to the interview room, and allowed the two men to speak unsupervised.  Detective Stewart testified at the motion to suppress hearing that he did not give the Defendant's father any instructions on what questions to ask the Defendant.  Moreover, Det. Stewart said that during the period of time Mr. Johnson had exited the interview room, he would not have instructed him to ask any specific questions of his son.  The trial court properly concluded that Mr. Johnson "was not acting as a state agent."  See State v. Smith, 933 S.W.2d 450, 453 (Tenn. 1996) (citing Miranda, 384 U.S. at 444); see also Illinois v. Perkins, 496 U.S. 292, 296-97 (1990).

Significantly, the factors which suggested a "psychological ploy" to Justice Stevens, writing in dissent—insufficient advance warning to Mauro that his wife was coming to see him and Mauro's unwillingness to talk to her—are absent here.  The Defendant was informed at 29:31 on the videotape that his father was coming to talk with him, and his father did not enter the interview room until 45:46, over fifteen minutes later.  Mr. Johnson had been told of the Defendant's desire to speak with him and was escorted to the interview room.  The

Defendant was not only willing to see his father, but it was he who made the request. While Det. Stewart may have been aware of the psychological influence Mr. Johnson had on the fifteen-year-old Defendant, we cannot conclude that he deceptively exploited that influence.

Most of the police interrogation practices or "psychological ploys" about which the Miranda Court expressed concern have an element of deception or subterfuge about them:

> The questioned practices included "the use of lineups in which a coached witness would pick the defendant as the perpetrator . . . [,] the so-called 'reverse line-up' in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime," and a variety of "psychological ploys, such as to 'posi[t]' 'the guilt of the subject,' to 'minimize the moral seriousness of the offense,' and 'to cast blame on the victim or on society.'"

Mauro, 481 U.S. at 526 (quoting Innis, 446 U.S. at 299, 100 S.Ct. at 1689, (quoting Miranda, 384 U.S. at 450)) (brackets added by the Innis Court ).

Cases from other jurisdictions have recognized that while there is undoubtedly a psychological influence exerted upon an accused when he is visited in jail and urged to confess by a family member or close friend, the police do not transgress the Fifth Amendment by arranging such visits unless they instruct the visitor to elicit information or unless they know of, and therefore can be deemed to have sanctioned, the visitor's deception of the accused.  See, e.g, United States v. Kimbrough, 477 F.3d 144, 151 (4th Cir. 2007) (holding that the police did not subject the defendant to improper interrogation when they brought his mother to the basement to see drugs stored there because there was "no evidence in the record of a tacit agreement, discussion, or understanding between the police officers and defendant's mother that she would ask questions or attempt to elicit incriminating information"); United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990) (accused not "interrogated" when his aunt, a police department employee, urged him, without prompting by police, to reveal information); Snethen v. Nix, 885 F.2d 456, 457 (8th Cir. 1989), cert. denied, 496 U.S. 940 (1990) (accused not "interrogated" when his mother, who gained access to him in prison by telling police "[i]f [my son] did this, he will tell me," exhorted accused to confess so that her other son, accused's half-brother, would not be unjustly punished); Endress v. Dugger, 880 F.2d 1244, 1248-49 (9th Cir. 1989) (detective who was close friend of defendant and visited him to inquire on his well-being, rather than at direction of officer connected with investigation, did not subject defendant to "functional equivalent of interrogation," and thus, statements made by defendant to detective were not obtained in violation of Miranda); Cory Lane Tower v. Charles L. Ryan, No. CIV 09-1186-PHX-MHM (MHB), 2010 WL 3327596, at *9 (D. Ariz. July 13, 2010) (statement which defendant made

to parents in course of meeting in jail interview room was not the product of interrogation); Richard Adams Hovey v. Arthur Calderon, Warden, No. C 89-1430 MHP, 1996 WL 400979, *29 (N.D. Cal. July 10, 1999) ("Thus, if petitioner had made inculpating statements to his father even in response to his father's questions, the statements would be admissible and not in violation of petitioner's Fifth Amendment rights unless his father was being used by the government for this purpose [] even if the statements are known by petitioner to be monitored."); Gilchrist v. State, 585 So.2d 165 (Ala. Crim. App. 1991), cert. denied, (Ala. 1991) (statement which defendant made to girlfriend in course of meeting in jail interview room was not the product of interrogation); People v. Lucas, 548 N.E.2d 1003, 1010 (Ill. 1989) ("So long as the police have not incited or coached family members to prompt a confession, the fact that the defendant chose to speak to the police after conferring with [his mother and brother] does not make his waiver invalid"); State v. Romero, 552 So.2d 45, 50-52 (La. Ct. App. 1989), cert. denied, 559 So.2d 137 (La. 1990) (accused not "interrogated" when his father asked him, in presence of officer, "Son, did you really do that?"); State v. Perkins, 753 S.W.2d 567, 571 (Mo. Ct. App. 1988) ("Appellant's Miranda rights were violated when the police, through subterfuge and trickery in the form of [appellant's brother], a paid agent, elicited statements from appellant").

We are cognizant of the fact that the subsequent request by the Defendant to speak with his father would never have occurred if Det. Stewart had, as he should have, "scrupulously honored" the Defendant's right to remain silent. However, we do not believe the meeting arranged between the Defendant and his father on June 26 was the "kind of psychological ploy that properly could be treated as the functional equivalent of interrogation," Mauro, 481 U.S. at 527, because there was no evidence either that Mr. Johnson was instructed to elicit information from the Defendant or that he practiced deception upon the Defendant.

Following the remaining part of the test suggested by Mauro, we must determine whether, viewing the situation from the Defendant's perspective, the Defendant "felt that he was being coerced to incriminate himself in any way" by Mr. Johnson's June 26 visit. On this issue, we believe the following observation by the Court in Mauro to be particularly instructive:

> In deciding whether particular police conduct is interrogation, we must remember the purpose behind our decisions in Miranda and Edwards [v. Arizona], 451 U.S. 477 (1981): preventing government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment. The government actions in this case do not implicate this purpose in any way. Police departments need not adopt inflexible rules barring suspects from speaking with their spouses, nor must

they ignore legitimate security concerns by allowing spouses to meet in private. In short, the officers in this case acted reasonably and lawfully by allowing Mrs. Mauro to speak with her husband.

Mauro, 481 U.S. at 529-30. We would be ignoring the plain facts of the instant case if we concluded that the police used the coercive nature of Defendant's confinement to extract from him an inculpatory statement he would not otherwise have made to his father in an unrestrained environment. The entire conversation between the Defendant and his father appears to be that of a son attempting to mitigate his conduct to some degree and a concerned parent seeking the best outcome for his child. The police never instructed the Defendant that he had to speak with his father, and he responded to his fathers limited questions willingly. If the Defendant was "coerced" to incriminate himself on June 26, the coercion was effected by his father individually and not by any conduct on the part of the police. Cf. Snethen, 885 F.2d at 459-60 ("Snethen's mother prodded Snethen, both in the presence of police and in a private discussion, to describe the . . . killing to the police so his half-brother would not be punished unjustly"; thus "[i]t was 'coercion' by his mother that led to Snethen's inculpatory remarks, not by the police").

In Colorado v. Connelly, 479 U.S 157 (1986), the accused, who suffered from "command hallucinations" incident to chronic schizophrenia, heard the "voice of God" telling him to confess. The United States Supreme Court held that his confession was not "coerced" within the meaning of the Fifth Amendment because it was not the product of police misconduct. Observing that the Fifth Amendment simply does not address itself to "'moral and psychological pressures to confess emanating from sources other than official coercion,'" the Court held that only "governmental coercion" is proscribed by that constitutional provision. Connelly, 479 U.S. at 170 (emphasis added).

We have determined that Mr. Johnson was not an agent of the police because there is no evidence that he was instructed by the police to question the Defendant or to get information from him. We have also concluded that his meeting with the Defendant was not a psychological ploy functionally equivalent to interrogation. Moreover, we now conclude that any "coercion" he exerted upon the Defendant to incriminate himself emanated from moral and psychological pressures inherent in the nature of their relationship and not from any police misconduct. The trial court did not err in permitting the State to introduce the redacted recording of the June 26, 2008 conversation between the Defendant and his father at the police station.

*E. Hearsay and the Sixth Amendment*

Next, the Defendant argues that his confrontation rights were violated because his father's statements were testimonial hearsay and, he was not permitted an opportunity to

cross-examine his father at trial. The Defendant also notes that although his father "did not demonstrate any personal knowledge regarding the homicide and could not have met the fundamental qualifications to be a witness as required by Rule 602 of the Tennessee Rules of Evidence, the State introduced a significant portion of his statements to the jury via the police recording."

The State responds that the statements of the Defendant's father were non-hearsay and were properly admitted to provide context for the Defendant's admissions or, alternatively, that some of the Defendant's reactions to his father's statements could be viewed as adoptive admissions. Regarding the Defendant's confrontation issue, the State contends that because the recorded statements were not hearsay as they were not offered for their truth, the Defendant's confrontation rights were not violated; according to the State, this is true even if the statements are viewed as "testimonial." Also, the States notes that the jury was instructed by the trial court on how to consider the father's statements and that the Defendant could have called his father to testify. The Defendant replies that his father's statements were testimonial and any defect could have been remedied by the State by simply calling his father to testify.

Generally, decisions regarding the admission of evidence are left to the sound discretion of the trial court. State v. Saylor, 117 S.W.3d 239, 247 (Tenn. 2003). "[T]rial courts are generally accorded a wide degree of latitude and will only be overturned on appeal where there is a showing of abuse of discretion." Id. However, "[w]hether the admission of hearsay statements violated a defendant's confrontation rights is . . . a pure question of law." State v. Franklin, 308 S.W.3d 799, 809 (Tenn. 2010).

Here the trial court addressed the Defendant's contention "that the State presented testimony of the father through his recorded statements with the Defendant," ruling as follows:

> The Defendant argues that this was error due to the fact that the Defendant's father did not "possess the fundamental qualifications to be a witness." The [c]ourt finds that it would amount to speculation for the [c]ourt to assess the father's capacity to be a witness in this case, due to the fact that his testimony was not before this [c]ourt. Furthermore, the [c]ourt specifically provided that the father's statements were not admitted for the truth of the matter asserted but "admissible only as they provide a meaning to the statements made by the individual identified as the [D]efendant["]. . . . The jury instructions continued clarifying the recorded statements, stating that, "Only the statements made by the person you identify as the [D]efendant may be considered by you on the question of whether the [D]efendant is guilty or not guilty of any offense." .

. . The [c]ourt finds, under the circumstances of this case, that the father's statements were not admitted as testimonial evidence or for the truth of the matter asserted, and the jury instructions properly charged the jury about the character of the statements and to limit their analysis accordingly.

Separately addressing the Defendant's confrontation argument, the trial court again concluded "that the statements made by the Defendant's father were not hearsay, as they were not offered for the truth of the matter asserted." The court then noted

that the jury was specifically instructed in the jury charged that the Defendant's father's statements were not admitted for their truth but only to give meaning to the Defendant's statements. The Defendant contends that since the State did not call the father as a witness, he could not be tested under cross-examination.

Finding the issue to be without merit, the trial court concluded "that the father was an available witness at trial and could have been called by the Defendant to testify." We agree with the reasoning of the trial court.

In Crawford v. Washington, 541 U.S. 36 (2004), the United States Supreme Court held that testimonial hearsay statements violate a defendant's rights under the federal constitution's Confrontation Clause and are only admissible when (1) the declarant is unavailable and (2) the defendant has had a prior opportunity to cross-examine the declarant. 541 U.S. at 68-69; see also State v. Maclin, 183 S.W.3d 335, 345 (Tenn. 2006), abrogated by State v. Cannon, 254 S.W.3d 287 (Tenn. 2008). When hearsay is non-testimonial, the Tennessee Rules of Evidence govern its admissibility. Franklin, 308 S.W.3d at 810. Non-hearsay statements— i.e., statements not admitted for the truth of the matter asserted—do not violate the Confrontation Clause, whether or not the statements are testimonial. Id.

Tennessee Rule of Evidence 801(c) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 802 provides that hearsay is not admissible except as allowed by the rules of evidence or other applicable law.

In State v. Gibson, 973 S.W.2d 231 (Tenn. Crim. App. 1997), this court addressed a similar argument. In Gibson, the victim's mother tape-recorded her conversation with the defendant in which the defendant admitted to having sexual relations with her daughter. The defendant objected to the admissibility of the mother's statements on the recording. The panel held that the statements were not hearsay and that their admission did not implicate the defendant's right of confrontation.

-21-

The Gibson Court relied heavily on the case of State v. Jones, 598 S.W.2d 209, 222-23 (Tenn. 1980), in which transcripts of taped conversations between a defendant and a non-testifying witness were presented to a jury by the agents who monitored them. Like the Defendant here, Jones raised the confrontation issue. The Tennessee Supreme Court in Jones said that it was neither a confrontation nor hearsay problem.

Just as in Gibson and Jones, Mr. Johnson's statements on the tapes were not hearsay because his statements were not offered for the truth of the matter asserted. Tenn. R. Evid. 801(c); see Jones, 598 S.W.2d at 223. His statements were not offered or intended to be substantive evidence. Rather, they were offered solely for the purpose of providing the context of the Defendant's statements. If Mr. Johnson's comments had been completely redacted from the tapes, the Defendant's statements would have made little sense. See State v. Price, 46 S.W.3d 785, 804 (Tenn. Crim. App. 2000) (citing Gibson, 973 S.W.2d at 243) (additional citation removed). As was the case in both Gibson and Jones, the State did not ask the jury to believe what Mr. Johnson said on the tapes. The State's primary objective was to bring before the jury the statements made by the Defendant. See Gibson, 973 S.W.2d at 243 (citing Jones, 598 at 223); see also State v. Stokely J.U. Way, No. E2002-00251-CCA-R3-CD, 2004 WL 234741, at *3 (Tenn. Crim. App. Feb. 9, 2004), perm. app. denied, (Tenn. May 24, 2004).

Because Mr. Johnson's statements are non-hearsay, the issue of confrontation does not apply to those statements. See Franklin, 308 S.W.3d at 810; see also State v. Derrick Sorrell, No. W2006-02766-CCA-R3-CD, 2009 WL 1025873, at *5 (Tenn. Crim. App. Apr. 8, 2009 ("The audiotape contained a conversation between the defendant and a second person and cannot be barred by the Confrontation Clause because the conversation was not offered for truth, but instead for context and evidence of knowledge."), perm. app. denied, (Tenn. Aug. 17, 2009). Moreover, what the court said in Jones is applicable here: "The issue of confrontation does not arise as to her. The mere fact that cross-examining her would have been a defense lawyer's delight, and that this opportunity did not present itself, does not operate to add a constitutional dimension to the situation." Jones, 598 S.W.2d at 223.

The Jones Court held that tape recordings may be presented by any witness who was present during the recording or any witness who monitored the recording as long as he can identify the declarant with certainty and his testimony comports with the other rules of evidence. 598 S.W.2d at 223. The court continued,

> In all such cases the jury should be instructed that only the statements, admissions and declarations of the declarant may be considered in the question of guilt or innocence. Further any statement made by a non-testifying party to

the conversation which tends to be prejudicial to the defendant must be redacted, unless admissible under some other rule of law.

Id. In Jones, the court found that full opportunity was given to cross-examine the agent who presented the transcripts to the jury. Id. at 224.

The same can be said in the case at hand, the Defendant was given and used his full opportunity to cross-examine Det. Stewart, the officer who presented the recording to the jury. Moreover, the trial court here gave the instruction outlined in Jones, instructing fully as follows:

> The tape contains statements made by the [D]efendant and the [D]efendant's father. The statements of the [D]efendant's father are not admitted for the truth of the matter asserted by him. These statements of the [D]efendant's father are admissible only as they provide meaning to the statements made by the individual identified as the [D]efendant. Only the statements made by the person you identify as the [D]efendant may be considered by you on the question of whether the [D]efendant is guilty or not guilty of any offense.

As discussed infra, the trial court properly removed any prejudicial references to the unrelated burglaries. The trial court fully complied with the dictates of Jones.

Because the State did not offer the statements as substantive evidence, the statements were not hearsay, and they did not violate the Defendant's right to confrontation. Moreover, the instruction outlined in Jones was given.

As for any argument that his father did not "meet the fundamental qualifications to be a witness as required by Rule 602 of the Tennessee Rules of Evidence," the Defendant's reliance upon Rule 602 is misplaced. That rule, in pertinent part, provides as follows:

> Lack of personal knowledge.—A witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony.

Tenn. R. Evid. 602. We agree with the trial court that any assessment of the father's capacity to be a witness would be speculative because the Defendant's father did not testify. The Defendant is not entitled to relief on this issue.

*F. Redaction*

In addition to these constitutional violations, the Defendant submits that, although the trial court attempted to have the recording redacted to remove all references to the unrelated car burglaries, the redaction was insufficient to remove all references to other crimes. The Defendant argues that admission of the recording was prejudicial because "[i]n order to explain his words to the jury, the [D]efendant was placed in the position where his only means of explanation would be to testify about his arrest for unrelated crimes he had asked the [c]ourt to exclude." In essence, he contends that he was "forced to chose [sic] between the right to remain silent and having a trial free of proof of unrelated crimes." The State replies that the trial court did not err in its ruling regarding the redaction of the taped conversation.

In denying the Defendant's motion for a new trial, the trial court found this issue to be without merit, ruling as follows:

> The [c]ourt notes that the Tennessee Rules of Evidence do provide some protections against the admission of prior unrelated crimes; however, the Defendant does not have a right to a "trial free of proof of unrelated crimes." . . . The [c]ourt has reviewed the redacted transcript of the recording in this case and finds that every attempt was made to redact any portion that mentioned prior burglaries. Furthermore, the [c]ourt finds that the probative value was not "substantially outweighed by the danger of unfair prejudice" by the introduction of the recorded statements. Tenn. R. Evid. 403.

The Defendant filed a motion in limine to exclude any testimony about other crimes. Prior to trial, the trial court parsed the transcript of the Defendant's conversation with his father line-by-line and ordered that all statements arguably referring to the burglaries be removed from the transcript and the recording. Prior to admission of the recording and transcript at trial, defense counsel was given an opportunity to review the redacted versions and agreed that the redactions ordered by the trial court had been done. We agree with the State that there was nothing in the redacted version to suggest that the Defendant was in the interview room for any reason other than his possible involvement in the murder. Moreover, as the trial court correctly found, a defendant does not have a right to "a trial free of proof of unrelated crimes." We find no abuse of discretion on the part of the trial court in admitting the recording in its redacted version, properly concluding that the probative value of the evidence was not unfairly outweighed by its prejudicial aspects.

*II. Testimony of the Victim's Brother*

The Defendant also filed a motion in limine seeking to exclude the testimony of Nordin Osman, the victim's brother. The victim's brother testified that the victim was a cab

driver and described the victim's usual routine after leaving work: that he usually got off work around eight in the evening and would sometimes either go to pray or get food before coming home.

The Defendant argues that the trial court should have excluded the testimony of the victim's brother on grounds that it was not relevant. He contends that the victim's brother's testimony lacked probative value because the brother was not present when the shooting occurred or to any event related to the shooting. Moreover, the Defendant notes as prejudicial in this regard that the State made an appeal to the jurors for sympathy during closing argument regarding the "American Dream." The State responds that the trial court did not err in admitting the brief testimony of the victim's brother because it was relevant to the issues on trial and the probative value of the testimony was not substantially outweighed by the danger of unfair prejudice.

In its order denying the motion for a new trial, the trial court reasoned that this contention was without merit:

> The [c]ourt finds that there was probative value to the brother's testimony. The [c]ourt notes that his testimony was probative of the fact that a life in being was alleged to have been killed. Additionally, the [c]ourt notes that the brother's testimony established the victim's occupation as a cab driver and his daily routine, which was probative of the facts that robbery may have been a motive, as the victim carried cash on his person at the end of the night. Furthermore, the [c]ourt finds that any prejudicial value of the brother's testimony did not substantially outweigh the probative value.

Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Generally, relevant evidence is admissible, while irrelevant evidence is inadmissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded if its probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. "The admissibility of evidence under Rule 403 of the Tennessee Rules of Evidence is a matter within the trial court's discretion and will not be reversed on appeal absent an abuse of that discretion." State v. Biggs, 218 S.W.3d 643, 667 (Tenn. Crim. App. 2006) (citing State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997)).

We agree with the trial court that the victim's brother's testimony was relevant to the issues on trial. The brother testified about his personal knowledge of the victim's occupation

and routine. We agree with the State that simply because the brother did not witness the crime, does not render his testimony irrelevant. The trial court did not abuse its discretion in determining that the evidence was relevant and that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Although simply a bare allegation, the Defendant also seemingly argues that the State improperly appealed to the jury's sympathy during closing argument. During closing argument, the prosecutor made the following statement:

> . . . but one of the things about the American dream and one of the things about coming to the United States and living here is that we do have a system of justice and at this point all that is left of the American dream for [the victim] is American justice.

However, no objection was lodged during closing argument, and failure to object contemporaneously to improper argument constitutes a waiver pursuant to Rule 36(a), Tennessee Rules of Appellate Procedure. Moreover, the Defendant makes no real argument about misconduct on appeal, likewise resulting in waiver of the issue. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Briefly, we note that the context of the statement indicates that it was made to impress upon the jury the importance of their deliberations. Considering the trial court's instruction to the jury that the attorneys' arguments were not evidence, we conclude that the statement did not affect the verdict to the Defendant's prejudice. The Defendant has not established plain error.

### III. Sufficiency of the Evidence

The Defendant argues that the evidence is insufficient to support his conviction for second degree murder, a "knowing killing of another." He notes that none of the State's witnesses were able to provide an account of the circumstances surrounding the shooting or how or why the shooting occurred. Moreover, the Defendant submits that the jury rejected the State's theory of an attempted robbery and that the recording of the conversation between the Defendant and his father lacked any statement of guilt.

The State responds that the jury could conclude beyond a reasonable doubt that the Defendant knowingly killed the victim. While there were no eyewitnesses to the murder, the Defendant's admissions that he "shot" somebody and his efforts to get rid of a gun show guilty knowledge consistent with causing the death of another. Although the jury, by its verdict, rejected a finding that the murder was committed during an attempted robbery, this finding does not discredit the determination that the Defendant was responsible for the

homicide. The facts support a finding that the Defendant's actions of firing two close-range shots from a handgun into the victim would be reasonably certain to cause his death.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. <u>See</u> <u>State v. Sheffield</u>, 676 S.W.2d 542, 547 (Tenn. 1984); <u>see also</u> <u>State v. Cabbage</u>, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. <u>See</u> <u>State v. Bland</u>, 958 S.W.2d 651, 659 (Tenn. 1997). A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict." <u>Id.</u>; <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982). "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." <u>State v. Pendergrass</u>, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

Our supreme court recently clarified that circumstantial evidence is as probative as direct evidence. <u>State v. Dorantes</u>, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." <u>Id.</u> at 380 (quoting <u>State v. Crawford</u>, 470 S.W.2d 610, 612 (Tenn. 1971)) (quotation marks omitted). Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." <u>Id.</u> at 381. To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." <u>State v. Sisk</u>, 343 S.W.3d 60, 67 (Tenn. 2011).

A person is guilty of the offense of second degree murder, as relevant here, upon committing a knowing killing of another. Tenn. Code Ann. § 39-13-210(a)(1). Our Supreme Court has determined that second degree murder is a "result of conduct" offense. <u>See</u> <u>State v. Brown</u>, 311 S.W.3d 422, 431-32 (Tenn. 2010); <u>State v. Ducker</u>, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); <u>see</u> <u>Brown</u>, 311 S.W.3d at 431. Whether a

defendant acts knowingly in killing another is a question of fact for the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

We conclude that there was sufficient evidence for a reasonable jury to have found a knowing killing of the victim beyond a reasonable doubt. The victim was shot twice in the torso while attempting to enter his apartment on Lenore Street. The testimony of Antwain Kelly and Kelly's mother placed the Defendant in the area of the murder on the evening of June 17, 2008. Kelly spoke with the Defendant, who told him that "[h]is daddy and some dude got into it over something." About ten to fifteen minutes later, Kelly saw the Defendant coming from the direction of Lenore Street. The Defendant said to Kelly, "I shot the n----r," and walked off. Shortly thereafter, Kelly saw an ambulance and heard helicopters. Kelly's mother testified that, based upon the way the Defendant was "fumbling" with his pants, she believed the Defendant was armed when she observed him talking with her son. Jerome Holt stated that, sometime in the days thereafter, the Defendant ran up to him and was out of breath, told him that he had shot somebody, and offered to sell him a gun. Finally, the Defendant made statements during the conversation with his father at the police station evidencing knowledge that there was a gun involved in the murder, which the police had not found, that the gun needed to remain hidden so the police could not prove he did it, and that there were no witnesses to the crime.

While it is true that there were no eyewitnesses to the crime and that the jury by its verdict rejected a finding that the murder was committed during an attempted robbery, there was, nonetheless, sufficient proof that the Defendant knowingly caused the killing. See Tenn. Code Ann. § 39-11-301(a)(2). The Defendant's admissions that he shot someone, his proximity to the murder scene, his efforts to conceal a weapon, and the statements he made to his father at the police station, combined with the evidence of two close-range shots to the victim's torso, support the jury's verdict. He is not entitled to relief.

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE